FIFTH DIVISION
February 25, 2011

1-09-3606

No. 1-09-3606

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| TAHIR HASSAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| | ) | |
| | ) | No. 06 CH 22974 |
| v. | ) | |
| | ) | |
| AQEEL YUSUF and MOHAMMED F. SIDDIQUI, | ) | Honorable |
| | ) | Rita M. Novak, |
| Defendant-Appellants | ) | Judge Presiding. |
| | ) | |
| | ) | |
| | ) | |
| (Pak Associates, Inc. and Prime Petroleum, Inc., | ) | |
| | ) | |
| Defendants). | ) | |

**OPINION**

JUSTICE JOSEPH GORDON delivered the judgment of the court, with opinion. Justices Howse and Epstein concurred in the judgment and opinion.

Defendants Aqeel Yusuf and Mohammed Siddiqui appeal from a judgment of the circuit court of Cook County against defendant Yusuf for fraud, and against defendant Siddiqui for breach of contract, in which the court entered an award of rescission in favor of plaintiff and ordered a return to plaintiff of $168,724.31 for damages. Defendants contend that the judgment of the trial court against defendant Yusuf for fraud should be reversed because the evidence

1-09-3606

presented at trial was not clear and convincing. Defendants also maintain that, in any event, rescission was not an appropriate remedy in this case, and they further argue that, having awarded plaintiff rescission of the contract, the court's award of damages was unwarranted and inappropriate. Plaintiff cross-appeals from an order of the circuit court of Cook County denying his postjudgment motion to amend his complaint to join Siddiqui as a defendant in the count for fraud. Concomitantly, plaintiff cross-appeals from an order granting defendants' postjudgment motion to clarify its prior ruling, pursuant to which the court then found that Siddiqui was not liable for fraud.

**BACKGROUND**

This controversy arose out of the purchase of a gas station located at 16836 Oak Park Avenue, Tinley Park, Illinois, pursuant to an oral contract between plaintiff and defendants, a fact not in dispute. On November 6, 2006, after a disagreement with Yusuf and Siddiqui, plaintiff filed a complaint against defendants Yusuf, Siddiqui, Pak Associates, Inc., and Prime Petroleum, Inc., which was amended on March 12, 2007.[1] In the amended complaint, plaintiff states that he entered into an oral agreement with Yusuf and Siddiqui to purchase a gas station and the real property on which it was located, for which each of them would contribute $120,000. Plaintiff alleged that Yusuf falsely represented to plaintiff that "they would jointly acquire an automotive service station property and business enterprise." Plaintiff stated that "Yusuf failed to secure titled to the [p]roperty to be jointly held by the co-owners of the enterprise but instead caused such title to be conveyed solely to his corporation, Pak

---

[1]Pak Associates and Prime Petroleum are not parties to this appeal, and we use the term "defendants" when referring to defendants Yusuf and Siddiqui.

-2-

[Associates], Inc.," a company which is owned only by Yusuf and Siddiqui. According to the complaint, on or about August 18, 2003, "Yusuf, acting without [plaintiff's] knowledge or consent, turned the accounting and financial operation of the business over to Yusuf's corporation, Prime [Petroleum], Inc." Plaintiff alleged that Yusuf's misrepresentations were made "for the purpose of inducing [plaintiff] to invest in what he reasonably believed was to be joint ownership in the [e]nterprise, including ownership of the [p]roperty," and that plaintiff, in fact, invested $120,000 relying on those misrepresentations. In light of those allegations, plaintiff sought a judgment against Yusuf for fraud (count I) and breach of fiduciary duty (count II), and a judgment against Yusuf and Siddiqui for breach of contract (count III). He also sought a declaratory judgment that plaintiff is the owner of one-third of the gas station and the real estate (count IV), and an accounting to plaintiff of one-third of any income earned by the gas station (count V).

Defendants filed an answer in which they disputed that plaintiff purchased any interest in the gas station's underlying real estate and in which they maintain that plaintiff did not pay his share of the losses incurred by the gas station. On March 7, 2007, defendants Yusuf and Siddequi filed a counterclaim, in which they sought to recover one-third of the losses incurred by the gas station, which they alleged plaintiff was responsible for under the terms of their contract. They claim to have paid a total of $128,206 in shortages and seek reimbursement for one-third of that sum, or $42,735, from plaintiff.

The parties do not dispute that Pak Associates is a company owned only by Yusuf and Siddiqui and that the gas station in question was originally acquired in the name of Pak Associates. They also do not dispute that the financing was secured to purchase the gas station

through Midwest Bank and Trust, in the name of Pak Associates. In addition, it is undisputed that the gas station's business operations were later transferred to Prime Petroleum, a company created after the purchase of the gas station, and that Pak Associates retained its underlying real estate.

At trial, plaintiff testified on his own behalf during his case-in-chief, was later called by defendants as an adverse witness during defendant's case-in-chief, and subsequently testified during his rebuttal. For the sake of composition brevity, we shall combine all of his testimony given during the various stages of trial. Plaintiff testified that he was born in Pakistan, where he acquired an associate's degree in accounting at Karachi University. Since coming to the United States in 1990, plaintiff had acquired real estate of his own and had worked at his brother's gas station for about 10 years before entering into a business relationship with defendants. According to plaintiff, he worked at his brother's gas station as a regular employee, but did not manage it. Plaintiff also testified that he met defendant Yusuf in the1990s, when they lived in the same apartment complex and they both worked at gas stations. Plaintiff explained that he developed a friendship relationship with defendant Yusuf and that their families spent time together regularly. Plaintiff acknowledged that Yusuf moved away two years before they went into business together, but maintained that they continued to see one another on a weekly basis.

Plaintiff further testified that, in 2003, he and Yusuf discussed the purchase of a gas station, and after plaintiff and defendants looked at a few stations in the Chicago area, Yusuf became interested in the Clark station in Tinley Park because it was not far from his home and it was available for purchase. According to plaintiff, his initial discussion to purchase the Clark station was only with Yusuf, but he later agreed to include Yusuf's business partner, Siddiqui, in

the purchase of that gas station. Plaintiff understood that Yusuf and Siddiqui already owned a BP gas station. Plaintiff later met with defendants Yusuf and Saddiqui at their BP gas station, at which time the parties agreed that they would each contribute $120,000 to buy the Clark gas station. According to plaintiff, the parties also agreed that they would each own a one-third interest in the gas station, and defendants never mentioned to plaintiff or indicated to him that he would not acquire his own interest in the real estate on which the station was located. Under that agreement, plaintiff was to run the gas station and receive a salary as a manager and additionally, to share one-third of the profits and losses as a partner. According to plaintiff, Yusuf told him that the Clark station would cost about $800,000 and that the parties would make a down payment of $300,000 and "take a loan" from Midwest Bank for the remainder of the purchase price. Plaintiff also stated that, under the agreement, the Clark station would make the payments due on the mortgage directly to the lender, which would be deemed to satisfy "rent" payments to Pak Associates, apparently in whose name the company was originally acquired. According to plaintiff, Yusuf claimed that this arrangement would save money in taxes.

Plaintiff does not dispute that Pak Associates is owned only by Yusuf and Siddiqui. However, during plaintiff's testimony, he referred to Pak Associates as "our company" and stated that at the time of the parties agreement, he believed that he was becoming an owner of Pak Associates because Yusuf directed him to deposit his money in Pak Associates' bank account, and that was the company that took the mortgage. Although plaintiff's testimony is less than fully articulate on this point, he appeared to state that he believed that Pak Associates was taking the mortgage and holding the Clark station for the benefit of all three parties because they each were to contribute an equal amount to purchase the Clark station.

Plaintiff further testified that he learned from Yusuf that their bid to purchase the gas station was successful, and he acknowledged that he had no involvement with Bettie Smith, the realtor who assisted defendants in submitting the bid. Plaintiff also acknowledged that he had no dealings with Midwest Bank, the mortgagee, because Yusuf advised plaintiff that the "loan" would be taken in the name of Pak Associates, an accountant was retained to handle it, and neither plaintiff nor defendants needed to participate. Plaintiff averred that Yusuf told him that plaintiff did not need to be present at the closing of the transaction because the "gas station [was] in [the] company['s] name," apparently meaning that the Clark station would be acquired under Pak Associates' name. Plaintiff further testified that he "trusted" Yusuf and did not ask him about signing documents that show his investment. According to plaintiff, as of the closing date, on August 18, 2003, he had paid defendants a total of $70,000 by funding Pak Associates in that amount at defendants' direction.

Plaintiff further testified that when the parties began operating the Clark station in August 2003, Yusuf told plaintiff that they would form a separate company named Prime Petroleum and "keep Prime Petroleum for this gas station," apparently meaning that the ownership of the Clark station's business would be transferred to Prime Petroleum. However, nothing in the record indicates that plaintiff was told that the real estate on which the Clark station was located was held under separate ownership from the station's business. Plaintiff also testified that he "was thinking at that time Pak and Prime are the same."

Continuing his testimony, plaintiff stated that after closing, plaintiff began working the morning shift at the gas station, managing some of its day-to-day activities, such as working as a cashier, purchasing merchandise and paying bills by writing checks on the bank account of

Prime Petroleum, which Yusuf had opened. Plaintiff also testified that he, Yusuf and Siddiqui regularly deposited cash from revenues into Prime Petroleum's account. According to plaintiff, all workers were paid in cash, which is also how he received his share of the profits when Siddiqui distributed it among the three parties each month. He also stated that he never saw any documents reporting the gas station's finances. Plaintiff further testified that revenues from cash purchases were placed in the gas stations's safe, to which he, Yusuf and Siddiqui had a key. Plaintiff also testified that Yusuf sometimes took cash from that safe and merchandise from the gas station's store. Plaintiff also testified that he used the station's revenue proceeds to make payments to Midwest Bank on Pak Associates' behalf for the mortgage on the Clark station. Plaintiff acknowledged that one of the checks written to Midwest Bank was returned for insufficient funds, and Yusuf later covered that payment.

Plaintiff also testified that in 2005, he asked Yusuf for proof of plaintiff's co-ownership of the business, and Yusuf directed plaintiff to his accountant, Asif Waheel. Waheel then showed plaintiff a document entitled "Minutes of the first meeting of the board of directors of Prime Petroleum, Inc.," and was dated May 24, 2004. Plaintiff testified that he asked Waheel where in the document it appeared that plaintiff was an owner of the property, and Waheel then told plaintiff that his name was on the document as a shareholder of Prime Petroleum and that the gas station was held in that company's name.[2]

Plaintiff further stated that in that same year, he began to distrust defendants because he felt that he was not being "respected"as a co-owner of the Clark station, so he consulted an

---

[2]As shall be further discussed below, that document does not purport to identify plaintiff as a shareholder, but only an officer.

attorney, Mr. Michael Moses. It appears that Moses then wrote a letter to Yusuf demanding documentation of the gas station finances and of plaintiff's ownership of that station. Yusuf did not respond to the letter, reprimanded plaintiff for consulting a lawyer, and told plaintiff that they could resolve their issues among themselves.

Plaintiff further testified that he later met one individual named Mr. Javaid Khan (later identified by another witness as a real estate broker) at the gas station, who told plaintiff that he was "buying" the station and that he had already met the station's two owners. When plaintiff asked Yusuf about that matter, Yusuf confirmed that he was selling that property and told plaintiff that he would let him know when the deal is finalized. According to plaintiff, he told Kahn that if Kahn bought the Clark station, plaintiff wanted to remain a co-owner of the station and work with Kahn. Accordingly, plaintiff stated that he signed a contract with Kahn describing himself as one of the buyers of the station, along with another buyer named Jana Ignatova, on whose behalf Kahn would purchase the station. Plaintiff subsequently had a meeting with Yusuf, Siddiqui and Khan, at which time defendants told Khan that plaintiff had an ownership interest only in the gas station business, a statement that plaintiff did not appear to understand at the time, but which apparently meant that plaintiff was not a co-owner of the real estate. Defendants also, for the first time, accused plaintiff of stealing $60,000 from the gas station in cash.

Although these facts do not appear in any other context aside from the trial court's judgment order, plaintiff also testified that in June 2006, Yusuf directed plaintiff to sign a contract with Four Seasons Heating and Air Conditioning, for the purchase and installation of an air conditioning system at the Clark station. After doing so, plaintiff was required to personally

pay for the air conditioning system. After making several payments, plaintiff was sued for the remainder of the purchase price. Defendants refused to reimburse plaintiff for the amount paid and his continuing liability to Four Seasons.

Plaintiff averred that later in 2006, Yusuf told him that the gas station was losing money, which plaintiff attributed to Yusuf's removal of cash and merchandise from the business. However, plaintiff acknowledged that an increase in cigarette taxes in Cook County caused some customers to buy their cigarettes in Will County. Plaintiff also testified that he was not paid for two months in 2006. Furthermore, Yusuf advised him that because the gas station had incurred losses, plaintiff had to invest more capital as his share of those losses, otherwise he could no longer work at the gas station. Plaintiff then told defendants that he would not make that additional contribution until defendants produced an audited statement showing the business' losses because at that time, plaintiff believed that he was being "cheated." Defendants never produced such an audit, and plaintiff said that since date, he has not worked at the Clark station.

Plaintiff next called Kahn to testify. Kahn testified that he is a real estate broker, and that in April of 2006, he saw the Clark station listed for sale. He subsequently had a meeting with defendants Yusuf and Siddiqui to discuss purchasing the station. Defendants told Kahn that they were the only owners of the Clark station, and they entered into a contract with Kahn to sell the Clark station to an individual named Jana Ignatova, a buyer secured by Kahn. Kahn further testified that he later met plaintiff, who claimed to be an owner, and to have invested $120,000 in the Clark station. When he asked defendants why plaintiff was not listed as an owner on the contract, defendants told Kahn that plaintiff's investment was for his "job security," even though his salary as a manager was only about $8 per hour. Although Kahn was informed of the fact

that plaintiff had a preexisting interest in this gas station, Kahn testified that plaintiff signed the contract as a co-buyer in late April 2006. At that time, Kahn suggested that plaintiff should pledge $100,000 of his preexisting equity in the gas station as earnest money. Kahn said that defendants had first produced a profit and loss statement showing that the business was profitable, but at a later meeting with defendants and plaintiff, Yusuf and Siddiqui gave Kahn a new profit and loss statement which showed that the Clark station was operating at a loss. The transaction was thereafter aborted.

Plaintiff next called defendant Siddiqui as an adverse witness. Siddiqui actually testified three times over the course of trial. First, as plaintiff's adverse witness, next as defendants' witness during their case-in-chief, and last as defendants' rebuttal witness. Since there does not seem to be any special significance arising from the stage of trial at which testimony was given, we combine Siddiqui's testimony at each of these stages, as we did with plaintiff. Siddiqui testified that he has a bachelor's degree in accounting from Northeastern University. He averred that prior to owning the gas station here at issue, he and Yusuf had operated a BP gas station since 1993. He stated that he purchased the subject Clark station in 2003 and that this purchase was made with Yusuf from funds held in the name of Pak Associates, a company he jointly owned with Yusuf. According to Siddiqui, in the acquisition of the Clark station, he and Yusuf were required to submit $19,500 when they bid for the Clark station in June 2003, and an additional $54,000 when the bid was accepted on July 21, 2003. Both payments came from a bank account maintained in the name of Pak Associates. Siddiqui stated that the total amount paid when their bid was accepted came from Yusuf and Siddiqui, and none came from plaintiff.

Siddiqui stated that it was only after the bid had been accepted that he first learned that plaintiff was interested in owning part of the Clark station.

Siddiqui stated that before closing, he had a meeting with Yusuf and plaintiff, when the parties agreed that plaintiff would buy one-third of the Clark station business for $120,000. According to Siddiqui, plaintiff would not acquire any interest in the real estate, but the business would pay for the mortgage on the premises in the form of rent. Of plaintiff's $120,000 investment, $100,000 would be the price of plaintiff's interest in the business, and $20,000 would be his contribution to one-third of the gas station's inventory. According to Siddiqui, defendants made it clear to plaintiff that he was acquiring one-third of the gas station's "business," and defendants told plaintiff that he not have an ownership interest in real estate. Siddiqui stated that the realtor, Bettie Smith, helped defendants determine that the fair market value of the station's "business," without the real estate, was about $300,000, and that the real estate was valued at about $400,000. Thus, according to Siddiqui, plaintiff's commitment to invest $100,000 was to acquire one-third of the business only, and $20,000 was to pay for his share of the inventory.

Siddiqui further testified that he supervised the Clark station and, when necessary, helped plaintiff manage the station, and that he was the secretary of Prime Petroleum, which was the corporation to whom the Clark station business was transferred after its initial acquisition. Siddiqui further testified that at the end of each month, he, Yusuf and plaintiff calculated the station's "profit" based on the cash that was accumulated in the station's safe, and divided it among the three of them. According to Siddiqui, the "profit" was distributed in cash, there was no record of how much cash was distributed, and he never gave Yusuf or plaintiff W-2 forms

showing how much money had been taken. Siddiqui stated that the business was profitable in 2003, and in the beginning of 2004, but declined thereafter. Siddiqui also testified that at some point, plaintiff apparently stopped making mortgage payments on behalf of Pak Associates, which continued to hold the real estate, with money from Prime Petroleum, and as a result, either Siddiqui or Yusuf took money from the Clark station to make those payments.

Siddiqui further testified that at some point in February 2005, the gas station ran out of gas when their supplier, Texor, did not get paid. At that time, defendants told plaintiff that the gas station sustained losses, and they each had to pay their share of the gas bill or the station would close. Siddiqui also testified that plaintiff did not have the money, so he and Yusuf ultimately used money from Pak Associates to pay for the gas. The Clark station ran out of gas again in 2006, and in September of that year, defendants told plaintiff that he had to pay for his share of losses sustained by the gas station, which at that time, amounted to $38,612, so they could restock the station. Siddiqui testified that he determined that amount to be one-third of the total losses that the station had incurred over the course of several months up to that point. Those total losses later grew to $128,206, and reflected amounts owed to several other creditors. These debts were paid by himself and Yusuf with funds from Pak Associates. After that meeting, plaintiff left the gas station, and defendants later received a letter from his attorney. Siddiqui also stated that the Clark station continued to suffer ongoing losses thereafter and that plaintiff would be liable for one-third of those losses.

According to Siddiqui, he prepared the company's monthly profit and loss sheets, and he also prepared other "profit and loss sheets," which he gave to Kahn in connection with the possible sale of the station. He denied that the numbers on the sheets, which showed a profit,

were false. He stated that the numbers on those sheets were "estimates," based on the assumption that the new purchaser would obtain a long-term mortgage with lower monthly costs. Siddiqui admitted that he did not inform Kahn of that assumption. Moreover, Siddiqui testified that he did not learn that plaintiff was claiming ownership of the real estate after he and Yusuf signed a contract with Kahn to sell the station.

Plaintiff next called defendant Yusuf as an adverse witness, who also testified later during defendants' case-in-chief and defendants' rebuttal. As with Siddiqui, we also combine his testimony as given throughout the various stages of trial. Yusuf testified that he met plaintiff in 1992 when they lived in the same apartment complex, and that their families sometimes socialized together. According to Yusuf, he saw plaintiff about 10 times a year when they lived in that complex, and he moved 35 miles away from plaintiff eight years before buying the Clark station with plaintiff. After moving, Yusuf stated that he saw plaintiff maybe once a year.

Yusuf testified that he has a bachelor's degree in business management from Northeastern University and that he and Siddiqui have operated a BP Amoco gas station since 1992. Pak Associates, which Yusuf owns jointly with Siddiqui, leased the BP gas station's underlying real estate from BP from 1992 until 2009, when defendants purchased the premises as well. Yusuf further testified that when he and Siddiqui learned that the Clark gas station was for sale, they contacted their realtor, Bettie Smith, who helped them file their bid for the Clark station, which was then in bankruptcy. Yusuf signed the bid as the president of Pak Associates, on whose behalf the bid was made. According to Yusuf, he and Siddiqui offered $735,000 in their bid for the Clark station, having calculated that the business was worth about $300,000 and the value of the real estate was $400,000. Yusuf also testified that he paid $19,500 when the bid

was submitted, and an additional $54,000 when the bid was accepted on July 21, 2003 – all with a check from Pak Associate's account. Yusuf stated that the those payments were made before any money was received from plaintiff, because defendants did not receive any money from plaintiff until July 28. Plaintiff had no involvement with the realtor, or the bidding process. On July 24, 2003, Yusuf applied for a loan of about $600,000, from Midwest Bank to fund the acquisition of the Clark station, and it was after that date that plaintiff contacted Yusuf in regard to participating in that new business venture.

Yusuf testified that before closing, he had a meeting with Siddiqui and plaintiff, at which time defendants offered to sell plaintiff one-third of the Clark station's "business," but specifically told him that he was not receiving any interest in the underlying real estate. According to Yusuf the parties then agreed that plaintiff would pay $100,000 for one-third of the "business," $20,000 for one-third of the inventory, and that he would manage the Clark station's day-to-day operations. Yusuf denied telling Kahn that the money invested by plaintiff was for job security. Yusuf acknowledged that he and Siddiqui each invested the same amount from their own capital. The parties also agreed to split the profits among the three, and that the Clark station would make the payments on the Pak Associates mortgage to Midwest Bank, which would be credited as rent of the gas station premises to Pak Associates. Thus, Pak Associates would be the Clark station's landlord, but the mortgage payments were to be made on behalf of Pak Associates directly by the Clark station to Midwest Bank.

Yusuf further testified that plaintiff did not participate at closing on August 18, 2003, and that, by that time, plaintiff had contributed a total $70,000. That contribution included payments of $25,000 on July 28, 2003, $17,300 on August 13, 2003, another $25,000 on August 15, 2003,

and a final payment of $3,000. According to Yusuf, defendants' loan application was approved on July 31, 2003, and on the date of closing, Pak Associates executed a promissory note to Midwest Bank in the amount of $538,000 to purchase the Clark station. Yusuf and Siddiqui personally guaranteed the loan, but plaintiff did not sign any documents obligating him for the loan to Midwest Bank. Also at closing, the Clark station was conveyed to Pak Associates by a quit claim deed. Yusuf testified that he formed Prime Petroleum around the time.

Yusuf also testified that he, Siddiqui and plaintiff took over the Clark station on August 21, 2003, and plaintiff began working at the station on that day. Yusuf opened a bank account in the name of Prime Petroleum, the company to which the gas station business was transferred. Siddiqui, plaintiff and Yusuf were signatories on that bank account. Yusuf further testified that he was the president of Prime Petroleum and was present at monthly meetings when money was taken from the safe of the Clark station and distributed among the three parties. According to Yusuf, they would let cash proceeds from sales accumulate in the safe at the end of the month and distribute the monthly profit in cash among plaintiff, Siddiqui and himself.

Yusuf also testified that when plaintiff asked for proof that he was an owner of the Clark station, he contacted his accountant to prepare documentation showing plaintiff's interest. Yusuf acknowledged that the document prepared was entitled "first meeting of the board of directors of prime petroleum on May 24, 2004," but there was no meeting on that, or any other date, and the document was only prepared in response to plaintiff's request. Moreover, no shares of Prime Petroleum stock were ever issued, but the Prime Petroleum tax returns reflected that Yusuf, Siddiqui and plaintiff were owners of Prime Petroleum. Yusuf further testified that in 2004, the business began to decline and plaintiff raised the issue of whether he had any ownership interest

in the underlying real estate, and that Yusuf then told plaintiff that defendants had never offered him any ownership interest in the premises. Yusuf attributed the decline to an increase in the cigarette tax, which caused them to lose sales to businesses in Will County, where that tax was lower.

Yusuf admitted that in 2006, he took money from the Clark station without authorization. However, he averred that he deposited it in Pak Associates' account to fund mortgage payments to Midwest Bank, since plaintiff stopped making the mortgage payments directly to Midwest Bank from the funds of Prime Petroleum, which he had agreed to do on behalf of Pak Associates to satisfy the Clark station's rent obligation. Continuing his testimony, Yusuf said that on two occasions, once in 2005 and once in 2006, the Clark station temporarily ran out of gasoline when it was unable to pay its supplier, Texor Petroleum. In the first of those occasions, Yusuf told plaintiff that they needed $42,000 to pay their supplier and replenish the station, but plaintiff told Yusuf that he did not have money to contribute, and Yusuf subsequently paid the suppliers from funds from Pak Associates. In the second of those occasions, in September of 2006, Yusuf had a meeting with Siddiqui and plaintiff, at which time defendants told plaintiff that he had to contribute his share of the bill from their supplier and pay his share of the previous bill. Defendants also presented plaintiff with a document prepared by Siddiqui which showed that the gas station had lost money, and that plaintiff's share of the loss was $38,612. According to Yusuf, they told plaintiff that they needed for him to pay his share of those losses so they could replenish the gas station. Plaintiff responded that he did not have the money at that time and stopped going to work. Yusuf further testified that he did not hear from plaintiff again until he

received a letter from plaintiff's attorney. According to Yusuf, the gas was replenished after plaintiff left, and the gas station resumed its operations.

Yusuf stated that he was contacted by Kahn in April 2006 to purchase the Clark station, and they signed a contract a week later to sell the station for $887,500. Yusuf later learned from Kahn that plaintiff claimed to be an owner of the station and its underlying real estate, and that he "wanted to buy" the ownership interest of Yusuf and Siddiqui in the gas station, in conjunction with another individual. Yusuf then told Kahn that plaintiff had no ownership interest in the real estate and therefore could not accept a proposal to pledge his interest in the real estate as earnest money for the property.

At the close of trial, the parties stipulated to the admissibility of a summary of plaintiff's payments to Pak Associates and Prime Petroleum, accompanied by copies of checks and bank statements, entered by plaintiff, which show that plaintiff contributed a total of $120,033 to defendants. Those contributions included the previously listed payments made before closing, which amounted to $70,000, and later sums, which included payments of $30,000 on September 23, 2003; $9,000 on December 15, 2003; $7,400 on January 31, 2004; $333 on May 4, 2004; and $3,000 on September 7, 2004.

The parties also stipulated to the admissibility of Prime Petroleum's articles of incorporation, entered by plaintiff, which show that they were filed on August 23, 2004, and that Yusuf is named as the registered agent. They also stipulated to the admissibility of form 2553, for "Election by a Small Business Corporation," filed on behalf of Prime Petroleum with the Internal Revenue Service, which has only Yusuf and Siddiqui named as shareholders. However, in Prime Petroleum's income tax returns, whose admissibility was also stipulated, plaintiff is

named as a shareholder on tax returns filed for the years 2003, 2004, 2005, 2006 and 2007, a fact to which the trial court alluded in its judgment order. Further, Prime Petroleum's income tax return for the year 2003 reports the company's income as $422, and its tax return for 2004 reports the company's income as $42,403. Both tax returns list plaintiff as a owning 33.33% of the company's shares.

In addition, several sets of minutes of the Prime Petroleum board of directors' meetings were entered by plaintiff, upon defendant's stipulation to its admissibility, three of which purport to be the "first meeting of the board of directors." The first set of minutes of Prime Petroleum's "First Meeting of Shareholders" is dated August 18, 2003, and the second set of the company's "First Meeting of Board of Directors" is dated August 19, 2003. Both the first and second sets state that defendants Yusuf and Siddiqui are the only shareholders of Prime Petroleum, each owning 500 shares. The third set of minutes of Prime Petroleum's "First Meeting of Board of Directors" is dated May 24, 2004, and did not name the shareholders of the corporation, but named plaintiff as treasurer, Yusuf as president and Siddiqui as secretary of Prime Petroleum. A fax cover sheet indicates that the set of minutes dated May 24, 2004, was sent to plaintiff on May 25, 2004. None of the minutes were signed, a fact to which the trial court alluded in questioning defendants' credibility.

In addition, plaintiff entered records from Midwest Bank, show that between September 26, 2003 and December 21, 2006, Pak Associates paid the bank a total of $135,972.92 in principal on the loan taken by defendants, reducing the principal balance from $558,000 to $412,591.81.

After closing arguments, the trial court issued its ruling on August 21, 2009. It found the testimony of plaintiff and Kahn to be more credible than defendants' testimony. It also found that the initial cash contributions by the three parties to the initial transaction were not significantly different and that the gas station and real estate were purchased as a package. The trial court then found that the parties' expectation was to pay for the remaining debt from the proceeds of the gas station's profits and that it made little sense that plaintiff would agree to invest a proportionate share of capital and work at a minimum wage for an investment in the business alone while defendants acquired the real estate for no additional investment of their own. Moreover, the court noted that defendants supplied Kahn false information and failed to pay taxes, keep records, and properly account for money coming in and going out of the business. The court also noted that defendants created a separate corporation, alluding to Prime Petroleum, to operate the business without informing plaintiff of his interest or relationship in the corporation. While the court did not find that the relationship between plaintiff and Yusuf was as close as plaintiff maintained, it found Yusuf's testimony denying any friendship not to be credible.

While plaintiff's testimony indicates that he asked Yusuf for proof of his co-ownership of the gas station in 2005, the court found that the request was made in 2004, presumably based on the fax sheet indicating that the minutes sent to plaintiff in response to that request were sent in May 2004.

In addition, the court found that "at least one-third of the $135,972.92 reduction in Pak [Associates'] loan principal balance from September 26, 2003 to December 21, 2006 was [paid] *** from [p]laintiff's proportionate share of profits of the Clark station's business." The trial

court also found that Prime Petroleum's tax returns show that plaintiff's income from the company was $141 in 2003 and $14,133 in 2004.

Accordingly, the trial court held that plaintiff established his claim for fraud against Yusuf, because he "induced plaintiff to contribute what was represented to be a one-third interest in the station, with real estate." In addition, the court found that plaintiff was justified in relying on Yusuf's misrepresentations, that the parties had a long-standing relationship, and that plaintiff trusted Yusuf and relied on Yusuf's superior business knowledge and experience. The court found that the evidence established that Yusuf's failure to disclose to plaintiff that he was not acquiring an interest in the real estate as part of his purchase of the Clark station was a material omission calculated to obtain his monetary contribution that went into the funds, which supplied the down payment at the closing.

Additionally, the court held that defendants Yusuf and Siddiqui breached an oral contract because under their agreement, the parties were to acquire the Clark station, including its underlying real estate, and share equally in the burdens and benefits. Although plaintiff performed under the agreement, defendants breached it by placing the real estate in a separate corporation that plaintiff "did not own or have any control over."

Finally, the court denied plaintiff's claim against Yusuf for breach of fiduciary duty because plaintiff failed to show the requisite special circumstances. No judgment was entered against Pak Associates and Prime Petroleum, and the court denied defendants' counterclaim for

breach of contract against plaintiff, that, having awarded plaintiff rescission, which cancels the contract, there was no basis to make an award against plaintiff based on shared expenses.[3]

As a remedy, the trial court granted plaintiff rescission of the agreement and return of the money paid to defendants in the amount of $120,000. The court also awarded plaintiff recovery of one-third of the principal payments made on Pak Associates' mortgage, namely, the sum of $45,324.31. In addition, the court awarded plaintiff recovery of the money that he was induced to pay as a personal obligation on the air conditioning unit installed at the Clark station, namely the sum of $3,400.

The trial court did not attempt to match damages on each count to the remedies that it awarded plaintiff. Although plaintiff's complaint of fraud (count I) was only against Yusuf, and his complaint of breach of contract (count III) was against both Yusuf and Siddiqui, the statement of the trial court apparently combined the fraud remedy, which applied only against Yusuf, and the contract remedy, which applied against both defendants. In doing so, the trial court stated that "[t]he contract is rescinded and plaintiff is awarded damages against defendants Yusuf and Siddiqui, in the amounts of $168,724.31 on counts I and III."

Plaintiff filed a motion to amend his complaint on October 6, 2009, pursuant to section 2-616 of the Illinois Code of Civil Procedure (735 ILCS 5/616 (West 2008)), which permits pleadings to be amended even after evidence is closed, and sought to name Siddiqui as a defendant on the count for fraud, which the trial court denied. Moreover, defendants filed a posttrial motion for clarification, in which they sought a postjudgment order clarifying that no

---

[3]Although the parties' oral contract involved the acquisition of real estate, the issue of enforceability of a contract that did not comply with the statute of frauds was not raised.

judgment of fraud was entered against Siddiqui. On November 23, 2009, the trial court entered a postjudgment order, amending its previous order and finding that defendant Siddiqui did not commit fraud and that no judgment was entered against him on that count. Defendants also challenged the appropriateness of the remedies awarded plaintiff in their postjudgment motion, which the trial court denied.

## ANALYSIS

On appeal from that final order, Yusuf challenges the finding of fraud and the appropriateness of the remedy of rescission based on the trial court's findings. Likewise, while neither Yusuf nor Siddiqui challenges the trial court's finding that they were in breach of their contract, they challenge the appropriateness of the rescission remedy provided for it. Yusuf first contends that the trial court should reverse the judgment of fraud against him because plaintiff failed to present clear and convincing evidence of a misrepresentation that plaintiff would be an owner of the real estate. Yusuf only makes two arguments in support of that contention. First, he maintains that the evidence does not establish that he misrepresented that plaintiff would be an owner of the real estate under their agreement, because the minutes of Prime Petroleum's meeting of the board of directors given to plaintiff were silent about that company's ownership of the Clark station's underlying real estate. Second, he argues that plaintiff had notice that he was not an owner when he made mortgage payments to Midwest Bank on behalf of Pak Associates, which is owned only by defendants. Yusuf's attempt to challenge the trial court's finding of fraud falls short of the mark.

To prevail on an action for fraud, plaintiff must establish by clear and convincing evidence: a false statement of material fact; knowledge by defendant that the statement is false;

intent to induce the other party to act; reliance by plaintiff on that misrepresentation; and injury caused by that reliance. *Wright v. Richards*, 144 Ill. App. 3d 450, 457, 494 N.E.2d 1269, 1274 (1986). Fraud may be perpetrated by a misrepresentation or by concealment. *Chatham Surgicore, Ltd. v. Health Care Service Corp.*, 356 Ill. App. 3d 795, 803, 826 N.E.2d 970, 977 (2005). A reviewing court will not disturb a trial court's finding on a count of fraud unless they are against the manifest weight of the evidence. *Wright*, 144 Ill. App. 3d at 457, 494 N.E.2d at 1274.

In order to consist of fraud in the inducement, defendant must have made a false representation of a material fact knowing or believing it to be false and doing it for the purpose of inducing plaintiff to act. *Janowiak v. Tiesi*, 402 Ill. App. 3d 997, 1006, 932 N.E.2d 569, 579 (2010). The supreme court has held that "[a] representation may be made by words, or by actions or other conduct amounting to a statement of fact." *Glazewski v. Coronet Insurance Co.*, 108 Ill. 2d 243, 250, 483 N.E.2d 1263, 1266 (1985). In that case, the court held that, where an insurance company issued coverage in return of a premium, it tacitly represented to the consumer that the insurance had value, and plaintiffs had, therefore, stated a cause of action for fraud. *Glazewski*, 108 Ill. 2d at 250, 483 N.E.2d at 1266; see also *Illinois Rockford Corp. v. Kulp,* 41 Ill. 2d 215, 225, 242 N.E.2d 228, 234 (1968) (where defendant told plaintiff that they were each receiving only $25,000 for the shares of stock in their jointly owned corporation, he created a false impression in plaintiff's mind that defendant would not also receive employment benefits in exchange for his shares).

In this case, the trial court found that Yusuf entered into an agreement with plaintiff to purchase the Clark station together and represented that plaintiff's contribution would be for a

one-third interest in the gas station, with real estate, which induced plaintiff to make that investment. The parties do not dispute that plaintiff entered into an agreement with Yusuf and Siddiqui in 2003 to purchase the Clark station and that, under that agreement, each of the three parties would contribute an equal amount of money toward that purchase and share an equal part of the profits. Further, the parties testified that under their agreement, the remainder of the purchase price would be secured with a mortgage on the real estate. Although defendants' testimony indicates that the loan was taken in the name of defendants' company, Pak Associates, and that personal liability under the loan was assumed only by defendants, we cannot lose sight of the fact that under the parties' agreement, the mortgage would be paid from the proceeds of the Clark station, in which plaintiff held a one-third interest. Such evidence of an agreement to contribute an equal amount into the station and to pay the mortgage with the business' proceeds sufficiently supports the trial court's finding that Yusuf's statements to plaintiff that his contribution would be for one-third of the Clark station implied that plaintiff would also be acquiring one-third of the real estate.

Contrary to Yusuf's contentions, there is sufficient basis to infer from plaintiff's testimony that he deposited his monetary contribution into Pak Associates' account with an understanding that the Clark station would be purchased by Pak Associates, for the benefit of all three parties. Although the record indicates that plaintiff made mortgage payments on the real estate on Pak Associates' behalf, which suggests that plaintiff knew that the real estate was held separately from the business, plaintiff testified that he believed that he had an interest in Pak Associates at the time he agreed to purchase the Clark station with defendants and that was why he deposited his contribution into Pak Associates' account. Moreover, plaintiff testified that

-24-

Yusuf told him that the reason for the arrangement to have the Clark station pay the mortgage as "rent" to Pak Associates was to save money in taxes. Thus, even if plaintiff knew that Pak Associates retained ownership of the real estate, the trial court was free to believe plaintiff's testimony that he believed that he was given an ownership interest in Pak Associates. If the trial court accepted that testimony, it sufficiently supports the trial court's finding that Yusuf represented to plaintiff that he would be an equal owner of the gas station and its underlying real estate.

Yusuf contends that, regardless of the foregoing, the minutes of Prime Petroleum's meeting of the board of directors given to plaintiff are a sufficient indicator that Yusuf never purported to convey an interest in the real estate to plaintiff, because the minutes contained no indication that he held an ownership interest in the real estate. Although the document produced to plaintiff does not purport to show that plaintiff had an interest in the real estate, it does not negate that supposition. More importantly, however, is the undisputed fact that plaintiff asked for that document, or any document of his ownership of the gas station, several months after he made his monetary contribution based on their agreement to acquire the Clark station together. In addition, there is reason to expect that document to show plaintiff's ownership of the real estate, because it was supposedly minutes of Prime Petroleum, and it is undisputed that plaintiff had an ownership interest in that company. Accordingly, the fact that the document produced to plaintiff does not reflect his ownership in the real estate is not inconsistent with the trial court's finding that Yusuf implicitly represented to plaintiff that he would have an equal ownership interest in the real estate at the time that he made his contribution. See *Kulp*, 41 Ill. 2d at 225,

242 N.E.2d at 234; *Glazewski*, 108 Ill. 2d at 250, 483 N.E.2d at 1266 (creating a false impression by words, actions or other conduct can amount to fraudulent misrepresentation).

Moreover, even assuming, *arguendo*, that the evidence was insufficient to establish that Yusuf made an affirmative misrepresentation regarding plaintiff's interest in the real estate, Yusuf's omission of the fact that plaintiff would not acquire an interest in the real estate would be sufficient to support the trial court's finding of fraud because the record contains overwhelming evidence of the parties' fiduciary relationship.

As this court has previously held, "[f]raud also may consist of the intentional omission or concealment of a material fact under circumstances creating an opportunity and duty to speak." (Internal quotation marks omitted). *Janowiak*, 402 Ill. App. 3d at 1006, 932 N.E.2d at 579 (quoting *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 25, 799 N.E.2d 756, 763 (2003), quoting *H.K. Warner v. Lucas*, 185 Ill. App. 3d 351, 354, 541 N.E.2d 705, 706 (1989)). "In order to prove fraud by the intentional concealment of a material fact, it is necessary to show the existence of a special or fiduciary relationship, which would raise a duty to speak." (Internal quotation marks omitted). *Janowiak*, 402 Ill. App. 3d at 1006, 932 N.E.2d, at 579 (quoting *Thornwood, Inc.*, 344 Ill. App. 3d at 25, 799 N.E.2d at 763, quoting *First Midwest Bank, N.A. v. Sparks*, 289 Ill. App. 3d 252, 260, 682 N.E.2d 373, 379 (1997)). In fact, "in a confidential or fiduciary relationship, the dominant party's silence alone may constitute fraudulent concealment." (Internal quotation marks omitted). *Janowiak*, 402 Ill. App. 3d at 1006, 932 N.E.2d at 579 (quoting *Thornwood, Inc.*, 344 Ill. App. 3d at 25, 799 N.E.2d at 763, quoting *Melko v. Dionisio*, 219 Ill. App. 3d 1048, 1061, 580 N.E.2d 586, 593 (1991)). A reviewing court will not disturb the trial court's finding on the breach of fiduciary duty unless it is against the

manifest weight of the evidence. *1515 North Wells, L.P. v. 1513 North Wells, L.L.C.*, 392 Ill. App. 3d 863, 874, 913 N.E.2d 1, 11 (2009).

Our supreme court held in *Kulp*, 41 Ill. 2d at 222-23, 242 N.E.2d at 233, a fiduciary duty exists between shareholders of a closely held corporation, where the parties decided to embark in a business venture together. In *Kulp*, 41 Ill. 2d at 217-18, 242 N.E.2d at 230, plaintiff and defendant were each 50% shareholders of a corporation on the verge of bankruptcy, and they decided that defendant would find a buyer for both parties' shares of stock. The parties had also been personal friends, had acquired the company together, and were its principal officers. *Kulp*, 41 Ill. 2d at 222, 242 N.E.2d at 233. Defendant negotiated a better deal for himself with the prospective buyers, under which the shareholders would each receive $25,000 for their shares of stock, but unbeknownst to plaintiff, defendant would also receive an employment contract and a share of the company's profit upon his termination. *Kulp*, 41 Ill. 2d at 220-21, 242 N.E.2d at 232. The court found that defendant's employment contract and profit-sharing benefits upon termination were part of the buyers' consideration for his share of stock. *Kulp*, 41 Ill. 2d at 221-22, 242 N.E.2d at 232-33.

The supreme court noted that a fiduciary relationship exists in all cases in which a confidential relationship has been acquired, and the origin of that confidence may be moral, social, domestic or merely personal. *Kulp*, 41 Ill. 2d at 222, 242 N.E.2d at 233 (citing *Pfaff v. Petrie*, 396 Ill. 44, 50, 71 N.E.2d 345, 348 (1947)). The court then reasoned that "[t]heir decision to form and operate as a corporation rather than a partnership does not change the fact that they were embarking on a joint enterprise, and their mutual obligations were similar to those of partners." (Internal quotation marks omitted). *Kulp*, 41 Ill. 2d at 222, 242 N.E.2d at 233

(quoting *Tilley v. Shippee*, 12 Ill. 2d 616, 624, 147 N.E.2d 347, 352 (1958)). The court then held that since the corporation's only two shareholders did not acquire its stock independently from each other and had a prior relationship, defendant stood in a fiduciary relationship with plaintiff. *Kulp*, 41 Ill. 2d at 222-23, 242 N.E.2d at 233; see also *Hagshenas v. Gaylord*, 199 Ill. App. 3d 60, 70, 557 N.E.2d 316, 322 (1990) (where stock was held by three shareholders, and the court held that "in a closely held corporation, the mere fact that a business is run as a corporation rather than a partnership does not shield the business venturers from a fiduciary duty similar to that of true partners").

In this case, we recognize that the trial court made a finding that plaintiff had not proved the existence of a fiduciary duty or a breach thereof. However, it would seem that that finding is directed entirely at count II of the complaint, which, as previously noted, raises a claim of breach of fiduciary duty against Yusuf based solely on his superior knowledge and experience. This finding does not purport to be derived from the special relationship between them as shareholders of a closely held corporation who embarked on a business venture together. Nothing in count II of plaintiff's complaint purports to assert the existence of a fiduciary relationship premised on those facts. Although the parties did not explicitly seek to invoke a fiduciary relationship on those grounds, either at trial or in this appeal, the underlying facts indisputably exist and control. As fully discussed above, the existence of those facts unquestionably creates a fiduciary relationship. *Kulp*, 41 Ill. 2d at 222-23, 242 N.E.2d at 233. Thus, the trial court's finding that there was no fiduciary relationship predicated upon the allegations of count II would not preclude a determination that a fiduciary relationship nonetheless existed based on the undisputed evidence of their co-venture. Accordingly, a

-28-

finding that a fiduciary relationship existed between plaintiff and Yusuf based upon their joint business venture would not require that we reverse the trial court's finding that no fiduciary relationship existed, where it is apparent that the trial judge's finding was predicated on the facts pleaded in count II and where the trial judge was not made sufficiently aware that the fiduciary relationship nonetheless existed by virtue of their joint business venture.

Even if the trial court's finding that there was no fiduciary relationship were absolute, there is sufficient evidence on the record to establish that such a finding would be against the manifest weight of the evidence and therefore reversible given the fact that a fiduciary relationship exists in all certainty based on their business venture together. Such result is consistent with the general proposition that a reviewing court is free to sustain a decision of the lower court, regardless of the fact that the lower court may have erred in disregarding those reasons, and/or the facts upon which they were predicated. *People v. Johnson*, 208 Ill. 2d 118, 129, 803 N.E.2d 442, 448-49 (2003). Consequently, Yusuf's omission that plaintiff would not acquire an interest in the real estate amounts to a misrepresentation upon which plaintiff's claim of fraud may be based.

The evidence in this case giving rise to the conclusion that a fiduciary relationship existed among the parties is overwhelming. As noted, there is no dispute among the parties that they did enter into a joint venture to purchase the gas station; the only dispute is whether the acquisition also included the underlying real estate. In fact, plaintiff testified, and defendants admitted, that they agreed to purchase the Clark station together and that each would contribute an equal amount as his initial investment. The parties' testimony also indicates that they agreed to split the Clark station's profits, which is corroborated by Prime Petroleum's tax returns, which

show plaintiff and both defendants listed as shareholders of that corporation. Further, both defendants admitted that plaintiff was an equal owner of the Clark station's business, which was held by Prime Petroleum. Moreover, there is no dispute that they shared the responsibility to maintain the gas station, nor is there any dispute as to their prior familiarity before the business was acquired, leading to the joint acquisition of the gas station. Although Yusuf denied having a friendship relationship with plaintiff, the trial court found that testimony not credible, and the parties do not dispute that they had known each other for more than 10 years before purchasing the gas station together. Accordingly, any finding by the trial court, predicated upon these facts, that no fiduciary relationship existed between plaintiff and Yusuf would be against the manifest weight of the evidence and reversible. Thus, there is no implication in the trial court's judgment order to preclude a finding that there was fraud, even if that fraud could be predicated on omission and concealment, rather than upon affirmative misrepresentation.

Having found that there is a sufficient basis to find a fiduciary relationship existed between plaintiff and Yusuf, which would support a finding of fraud based on omissions alone, we now turn to whether the evidence supports the trial court's finding that Yusuf omitted the fact that plaintiff would not acquire an interest in the real estate to induce plaintiff's monetary contribution. Where a fiduciary relationship exists and a transaction is entered into, the defendant has the burden to show by clear and convincing evidence that the subject transaction was equitable and just. *Peskin v. Deutch*, 134 Ill. App. 3d 48, 55, 479 N.E.2d 1034, 1039 (1985); *Babray v. Carlino*, 2 Ill. App. 3d 241, 251-52, 276 N.E.2d 435, 442-43 (1971).

Plaintiff testified that neither defendant ever told him that he would not acquire any interest in the real estate. While defendants testified that they specifically told plaintiff that

plaintiff's investment would be for one-third of the business, but not the real estate, the trial court found that their testimony was not as credible as plaintiff's. In addition, plaintiff's testimony that Yusuf omitted the fact that plaintiff would not acquire an ownership interest in the real estate was corroborated by the undisputed fact that under the parties' agreement, they would each contribute an equal amount, and take a loan for the remainder of the price, which would be paid back with the proceeds of the business. Although the real estate always remained in Pak Associates, which is owned only by defendants, plaintiff's testimony indicates that he believed that Pak Associates held the company's assets for the benefit of all three parties, which is why he deposited his contribution in that company's bank account. Thus, the evidence on record is sufficient to support the trial court's finding that Yusuf omitted the fact that plaintiff would not acquire the real estate of the Clark station in return for his monetary contribution. Accordingly, we conclude that the evidence on record is insufficient to rebut the presumption of fraud against Yusuf with clear and convincing evidence. In addition, based upon the overwhelming evidence in the record that a fiduciary relationship existed, and based upon the ample evidence to substantiate the fact that no disclosure was made to plaintiff to alert him that he would not receive any interest in the realty, the trial court had sufficient freestanding support for its finding of fraud by omission, without having to rely on that presumption against Yusuf.

We next note that the evidence of Yusuf's misrepresentation implicates the issue of whether a future promise to perform may amount to a misrepresentation that gives rise to a claim of fraud. This issue was not raised by the parties, but acknowledged by the trial court in its judgment. It is well established that a promise to perform an act accompanied by an intention not to perform is a misrepresentation upon which fraud can be based "if the false promise or

1-09-3606

representation of future conduct is alleged to be the scheme employed to accomplish the fraud."
(Internal quotation marks omitted). *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*,
131 Ill. 2d 145, 168, 545 N.E.2d 672, 682 (1989) (quoting *Steinberg v. Chicago Medical School*,
69 Ill. 2d 320, 334, 371 N.E.2d 364, 641 (1977)); see *Steinberg*, 69 Ill. 2d at 333-34, 371 N.E.2d
at 641 (plaintiff established a cause of action for fraud against private medical school, based on
the misrepresentation that the prospective student would be evaluated according to certain
academic and personal criteria, which was allegedly part of a scheme to accomplish fraud); see
also *Vance Pearson, Inc. v. Alexander*, 86 Ill. App. 3d 1105, 1112, 408 N.E.2d 782, 787 (1980)
(plaintiff established fraud by defendant, who promised to finish installing trucks by a certain
date with no intent to keep the promise, but intending for plaintiff to rely on that promise).

In this case, the trial court found that Yusuf represented to plaintiff that his contribution
was for a one-third interest in the gas station, with real estate. It also found that at that time,
Yusuf did not intend to convey any interest in the real estate to plaintiff, but acted with the intent
to induce plaintiff to make a monetary contribution toward the acquisition of the Clark station.
The evidence on record supports the trial court's conclusion. As noted above, the parties'
testimony show that they agreed to make the same contribution toward the purchase of the gas
station, and take a loan for the remainder of the price, which would be paid with the business'
proceeds. In addition, plaintiff testified that he was never told that he would not have an interest
in the real estate. Based upon the totality of the transaction, the trial court concluded that Yusuf
never intended to convey a one-third interest in the real estate to plaintiff, and in light of the
evidence on record, that is a plausible inference. Accordingly, the fact that Yusuf's
misrepresentation, or breach of his duty to disclose, involved a future promise with the intent not

-32-

to perform does not preclude our conclusion that the evidence on record sufficiently supports the trial court's finding that he committed fraud upon plaintiff.

Yusuf next contends that plaintiff did not establish by clear and convincing evidence that he justifiably relied on Yusuf's alleged misrepresentation that plaintiff would have an ownership interest in the real estate. He argues that plaintiff was not justified in relying on Yusuf's representation that he would have an ownership interest in the real estate because he was an educated and experienced man and knew that the real estate was owned by Pak Associates. In addition, Yusuf argues that plaintiff's reliance was not justified because his relationship with Yusuf had not been as close for several years, and this was their first business venture together. Yusuf also argues that plaintiff should have been alerted that he was not acquiring part of the real estate because at closing, he had contributed only $70,300 to acquire a property for about $800,000, and never signed any loan documents for any part of the purchase price. Yusuf further maintains that plaintiff did not justifiably rely on such a representation because he made mortgage payments on behalf of Pak Associates, a company solely owned by defendants because plaintiff should have been alerted that he did not have an ownership interest in the real estate because he held no interest in Pak Associates. In support of those contentions, Yusuf notes that plaintiff did not participate in the bidding process or dealt with the realtor, and never saw the purchase contract for the Clark station indicating that he had an ownership interest in the real estate, which, Yusuf claims, should have been sufficient to apprise him or raise the question of whether he was going to be an owner of the real estate under their agreement. Yusuf maintains that in light of the foregoing, plaintiff's reliance on his promise to have a one-third ownership in the real estate was not justified. We disagree.

In determining whether a party justifiably relied on another's representations, courts consider all of the circumstances surrounding the transaction, including the parties' relative knowledge of the facts available, opportunity to investigate the facts and prior business experience. *Luciani v. Bestor*, 106 Ill. App. 3d 878, 884, 436 N.E.2d 251, 256 (1982). Although reliance is generally not justified where the parties have equal knowledge or means of obtaining knowledge of the misrepresented facts, plaintiff may justifiably rely where defendant has created a false sense of security or blocked further inquiry, provided that the facts were not such as to put a reasonable person on inquiry. *Los Amigos Supermarket, Inc. v. Metropolitan Bank & Trust Co.*, 306 Ill. App. 3d 115, 127-28, 713 N.E.2d 686, 695 (1999). The trial court's finding on a count of fraud will not be disturbed unless it was against the manifest weight of the evidence. *Wright*, 144 Ill. App. 3d at 457, 494 N.E.2d at 1274; *Los Amigos Supermarket*, 306 Ill. App. 3d at 128, 713 N.E.2d at 695.

In addition, it is well established that in the absence of circumstances putting a reasonable person on inquiry, that person is justified in relying on a representation without engaging in further inquiry, especially where the misrepresentation concerns matters which may be assumed to be within the knowledge of the party making them. *Keeshin v. Levin*, 31 Ill. App. 3d 790, 796-97, 224 N.E.2d 898, 903 (1975). In *Keeshin*, 31 Ill. App. 3d at 795-97, 224 N.E.2d at 902-03, where the parties were the two shareholders of a close corporation who entered into an agreement for defendant to buy plaintiff's shares, the court found that plaintiff justifiably relied on defendant's representation that they owed $100,000 to a third party. In doing so, the court rejected defendant's contention that plaintiff should have suspected that his partner was a crook and investigated whether his representation was true. *Keeshin*, 31 Ill. App. 3d at 796, 224

N.E.2d at 903. The court then reasoned that because plaintiff was not involved in the transaction that supposedly gave rise to the purported debt, he had no information to suspect the fraud, and was justified in relying on defendant's representations. *Keeshin*, 31 Ill. App. 3d at 797, 224 N.E.2d at 903; see also *Los Amigos Supermarket*, 306 Ill. App. 3d at 127-28, 713 N.E.2d at 695 (plaintiff, who was an experienced business man, was justified in relying on defendant's representation that he would form a corporation with plaintiff as a part owner, where defendant had been plaintiff's attorney for 10 years and gave various excuses for not producing the company's financial records when plaintiff requested them).

In this case there is sufficient evidence in the record to support the trial court's finding that plaintiff was justified in relying on Yusuf's misrepresentations without further inquiry or investigations. Although plaintiff's testimony indicates that he has an associate's degree and owns real estate of his own, his testimony also suggests that he was relatively new to this country when he entered into a business transaction with Yusuf. In addition, plaintiff testified that when he entered into the agreement to purchase the Clark station, he did not have experience in managing a gas station, or operating a business, and that he knew that Yusuf had experience owning and operating a gas station with Siddiqui. Further, while this was the parties' first business venture together, there is no dispute that Yusuf and plaintiff had known each other for more than 10 years. While the relationship between plaintiff and Yusuf may not be as close as plaintiff suggests, the record supports the trial court's finding that the parties had a long-standing friendship and plaintiff trusted defendant as such. Such evidence supports the trial court's finding that plaintiff had a long-standing relationship with, and trusted Yusuf, and that plaintiff relied on Yusuf's superior knowledge and business experience.

1-09-3606

In addition, although the record indicates that plaintiff had contributed a total of $70,300 at closing and the purchase price was about $800,000, the record also shows that, under the parties' agreement, the majority of the purchase price would be paid for with a loan, which the parties would repay using revenue proceeds from the business. Additionally, nothing in the record indicates that defendants contributed more in the purchase of the Clark station than plaintiff, which supports the conclusion that plaintiff had no reason to suspect that his equity in the station and the real estate would be less than that of defendants.

Further, while the record indicates that under the parties' agreement, the Clark station would pay the mortgage on the premises as rent to Pak Associates, that is of no consequence if the trial court accepted plaintiff's testimony that he believed that he had an interest in Pak Associates and that using that company to acquire the Clark station was a formality. In addition, plaintiff's testimony suggests that under that agreement, Pak Associates would be the corporation used to purchase the Clark station and the three parties would each own a one-third interest in the station, which developed plaintiff's notion that he was acquiring an interest in Pak Associates. Thus, the evidence does not appear to suggest that plaintiff had a reason to suspect that he may not have an ownership in the real estate because he paid the mortgage on behalf of Pak Associates as a form of rent. Finally, the trial court was free to believe plaintiff's testimony that the reason why he did not participate in the bidding process, deal with the realtor, or see the purchase contract is that Yusuf assured plaintiff that the transaction would be done under a corporate name and he did not need to participate. Without a reason to suspect that he would not acquire an interest in the real estate, plaintiff would be justified in relying on Yusuf's representations, especially since he appears to have had superior knowledge of how the

-36-

transaction would take place. *Keeshin*, 31 Ill. App. 3d at 796-97, 224 N.E.2d at 903. Accordingly, the trial court's finding that plaintiff justifiably relied on Yusuf's misrepresentation was not against the manifest weigh of the evidence.

Defendants next contend that the proper remedy in this case is to enforce the contract between the parties and the trial court improperly rescinded the agreement. They contend that rescinding the contract was an abuse of discretion because plaintiff shared in the business's profits in 2003 and 2004 and did not seek any remedy from defendants until 2006, when the business was suffering losses. However, that contention cannot prevail, because it is not clear from the evidence on record when plaintiff became aware of Yusuf's fraud in inducing the contract or of defendants' breach of their agreement, and it does not appear that plaintiff was aware of those facts until after he stopped working at the gas station.

Rescission of a contract refers to cancellation of that contract, so as to restore the parties to the status quo *ante*, the status before they entered into the contract. *Newton v. Aitken*, 260 Ill. App. 3d 717, 719, 633 N.E.2d 213, 215 (1994). " 'Rescission is an equitable remedy, the application of which is left largely to the discretion of the trial court.' [Citation.]" *Newton*, 260 Ill. App. 3d at 719, 633 N.E.2d at 215. A court may award rescission of a contract where there was material breach, fraud, or mutual agreement. *Newton*, 260 Ill. App. 3d at 719, 633 N.E.2d at 216. A reviewing court will not disturb the trial court's decision granting or denying rescission of a contract unless it resulted from an abuse of discretion. *23-25 Building Partnership v. Testa Produce, Inc.*, 381 Ill. App. 3d 751, 757, 886 N.E.2d 1156, 1163 (2008).

Accordingly, the innocent party may prevent enforcement of a contract induced by fraud by seeking rescission. *Testa*, 381 Ill. App. 3d at 757, 886 N.E.2d at 1163 . However, a party

seeking to rescind a contract on the ground of fraud or misrepresentation must elect to do so promptly after learning of the fraud or misrepresentation. *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.*, 355 Ill. App. 3d 156, 165, 821 N.E.2d 706, 713 (2004).

It is well-established that an unreasonable delay in taking the necessary steps to set aside a fraudulent agreement will have the effect of affirming it. *Illinois State Bar Ass'n Mutual Insurance Co.*, 355 Ill. App. 3d at 165, 821 N.E.2d at 713. Notably, a party does not waive his right to rescind a fraudulent contract if he informs the other party of his intention to rescind the contract in a timely manner. *Illinois State Bar Ass'n Mutual Insurance Co.*, 355 Ill. App. 3d at 170-71, 821 N.E.2d at 717-18 . In *Illinois State Bar Ass'n Mutual Insurance Co.*, 355 Ill. App. 3d at 160, 821 N.E.2d at 710, an attorney's insurer waited more than one year before seeking a declaratory judgment that his contract to defend that attorney was rescinded because of a material misrepresentation. However, the court found that the insurer had not waived its right to rescind the policy where it sent a letter notifying the attorney that it would not renew his policy less than one month after learning of the misrepresentation. *Illinois State Bar Ass'n Mutual Insurance Co.*, 355 Ill. App. 3d at 170-71, 821 N.E.2d at 717-18 .

However, parties are not barred from rescission if they ask for that remedy years after the fraud occurred, but within a reasonable period after becoming aware of the facts giving rise to the fraud on which they base the complaint. *Pinelli v. Alpine Development Corp.*, 70 Ill. App. 3d 980, 1004-05, 388 N.E.2d 943, 960 (1979). In that case, plaintiffs were unaware of defendant's fraud and filed a complaint seeking a resulting trust against certain property, which had been transferred to a company that plaintiffs had sold to defendant. *Pinelli*, 70 Ill. App. 3d at 984-85, 388 N.E.2d at 946. During trial, evidence showed that defendant had misrepresented to plaintiffs

that he had a preexisting interest in that company when he bought plaintiffs' shares in the company, and plaintiffs filed a complaint for fraud six weeks thereafter. *Pinelli*, 70 Ill. App. 3d at 1001-05, 388 N.E.2d at 958-960.

Thus, the court in *Pinelli* found that although the fraud occurred some time before August 1970, but plaintiffs did not request rescission until December 1973, they did not become aware of the fraud until after close of the evidence, and were not barred from seeking rescission. *Pinelli*, 70 Ill. App. 3d at 1004, 388 N.E.2d at 960; cf. *Lipkin v. Burnstine & Chicago Raburn Corp.*, 18 Ill. App. 2d 509, 518-19, 152 N.E.2d 745, 750 (1958) (plaintiff barred from seeking rescission 17 months after taking possession of certain property where nothing indicates that defect was unascertainable by reasonable inspection).

Finally, if no evidence in the record suggests that a party seeking rescission had notice of the facts justifying such rescission prior to the time he sought that remedy, the record cannot support a finding that the party waived his right to rescind. *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 403 Ill. App. 3d 1, 5-6, 933 N.E.2d 860, 864 (2010). In that case, a third party entered into a contract with defendant in August 2008, subsequently agreed to several amendments to the contract, and later assigned its rights under the contract to plaintiff. *YPI 180 N. LaSalle Owner*, 403 Ill. App. 3d at 3, 933 N.E.2d at 862-63. Plaintiff released $6 million in earnest money to defendant, but subsequently failed to close on the transaction because it did not obtain financing due to a global credit crisis that year. *YPI 180 N. LaSalle Owner*, 403 Ill. App. 3d at 4, 933 N.E.2d at 863 . Defendant retained the deposited earnest money as his sole remedy for breach of contract, and plaintiff filed a complaint for rescission of contract based on impossibility of performance. *YPI 180 N. LaSalle Owner*, 403 Ill. App. 3d at 4, 933 N.E.2d at

863. Defendant argued, *inter alia*, that plaintiff did not have standing to seek rescission because the third-party assignor waived its right to seek rescission because it already knew of the global crisis when it assigned the contract and executed amendments to it, thereby affirming the contract. *YPI 180 N. LaSalle Owner*, 403 Ill. App. 3d at 5, 933 N.E.2d at 864. The court held that plaintiff had standing to seek rescind the contract because there was nothing in the record to suggest that at the time plaintiff or the third-party assignor executed amendments to the contract, they possessed knowledge of the 2008 global credit crisis to justify rescission of the contract. *YPI 180 N. LaSalle Owner*, 403 Ill. App. 3d at 6, 933 N.E.2d at 864.

In this case, it is not clear from the evidence on record the exact time frame when plaintiff could have become aware of Yusuf's fraud, or defendants' breach of their contract. The parties' testimony indicates that in September 2006, Siddiqui presented plaintiff with an accounting of the business's losses, and when plaintiff refused to contribute more capital, Yusuf ordered plaintiff not to go back the station. The evidence on record appears to suggest that it was not until that time that plaintiff stopped working at the Clark station and had a falling out with defendants. Thus, it does not appear that at any point before that time, plaintiff had any actionable indication that defendants had not given him any interest in the Clark station's most valuable asset, which was its real estate. The record also indicates that plaintiff filed his first complaint against defendants on November 6, 2006, two months after he was ordered not to go back to the gas station. This evidence supports the conclusion that the trial court did not abuse its discretion in granting a rescission of the parties' contract.

Although the record shows that plaintiff began asking Yusuf for proof of his ownership in the Clark station in 2004, he did not specifically inquire as to the real estate. The parties'

testimony suggests that Yusuf attempted to produce a set of minutes of Prime Petroleum's meeting of the board of directors, which purported to confirm plaintiff's interest in the Clark station, without mentioning plaintiff's ownership interest in the real estate, or lack thereof. In addition, plaintiff testified that the accountant who sent him that document averred that the minutes of the meeting indicated that plaintiff was a shareholder of the business. If the trial court accepted plaintiff's testimony that the accountant assured him that the minutes produced listed him as a shareholder of the business, which is all that plaintiff had asked for, the trial court was free to conclude that the absence of any mention to the real estate in the minutes was not an indicator that plaintiff was, or should have been, alerted to the fraud or breach of contract. In addition, while the parties' testimony indicates that plaintiff procured an attorney in 2005, the trial court could have accepted plaintiff's testimony that Yusuf told plaintiff that they could resolve their concerns without an attorney and that plaintiff accepted Yusuf's assurance and remained unaware of the fact that he did not have an interest in the gas station's real estate. Accordingly, the evidence on the record is insufficient to find that the trial court abused its discretion in granting a rescission of the parties' contract.

Alternatively, defendants contend that even if awarding plaintiff rescission were correct, awarding him one-third of the reduction in Pak Associates' loan principal balance was not proper because it is inconsistent with the remedy of rescission. We agree.

As previously indicated, the remedy of rescission contemplates voiding the contract as if it had never existed, returning the parties to the status quo *ante*, their precontract status, and generally requires each party to return to the other the benefits received under the contract. *Newton*, 260 Ill. App. 3d at 719-20, 633 N.E.2d at 216. In addition, it is well established that a

remedy based on rescission is inconsistent with a remedy of damages, which arises out of the enforcement of the contract, and the award of both is, therefore, inappropriate. *Newton*, 260 Ill. App. 3d at 720, 633 N.E.2d at 216-17. In that case, the trial court awarded rescission of a contract to plaintiff, who had sued defendants for fraud, and denied defendants damages on their countercomplaint for breach of contract. *Newton*, 260 Ill. App. 3d at 718, 633 N.E.2d at 215. The reviewing court, in affirming that decision, found that the election of rescission, which is the disaffirmance of the contract, requires the abandonment of an award of damages, which is consistent with affirmance of the contract. *Newton*, 260 Ill. App. 3d at 720, 633 N.E.2d at 216. Thus, the court held that a simultaneous award of both remedies would be inappropriate, since they are inconsistent. *Newton*, 260 Ill. App. 3d at 720, 633 N.E.2d at 216-17.

In this case, plaintiff's award includes the sum of $120,000, which he was induced to pay to Pak Associates in exchange for his interest in the Clark station; the sum of $3,400, which he was induced to pay for an air conditioning unit for the gas station; and the sum of $45,324.31, which is one-third of the principal payments made on the Pak Associates mortgage. The record indicates that the sum of $45,324.31, which was paid on the mortgage on the premises, originated from the Clark station's revenue proceeds. The trial court correctly notes that at least one-third of the $135,972 reduction in Pak Associates' loan principal balance from September 26, 2003, to December 21, 2006, was taken by defendants from plaintiff's proportionate share of the profits of the Clark station's business. However, plaintiff's right to one-third of the business's monthly profits is a benefit that arose under the contract. Thus, awarding him that sum in damages is consistent with affirming his contract with defendants and inconsistent with placing him in his precontract position. See *Newton*, 260 Ill. App. 3d at 720, 633 N.E.2d at 216-

-42-

17. Accordingly, we reverse the trial court's award with respect to this sum, and pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we reduce the judgment by $45,324.31.

Defendants further contend, and we agree, that they should have been awarded the return of the profits that plaintiff received when the business was profitable. It is a well-established principle that "[w]here rescission is awarded then, the proper measure of recovery is restitution of the consideration and other benefits received by the parties under the contract." (Internal quotation marks omitted.) (Emphasis omitted). *Puskar v. Hughes*, 179 Ill. App. 3d 522, 528-29, 533 N.E.2d 962, 967 (1989). This rule applies even where the party against whom rescission is sought committed fraud. *Puskar*, 179 Ill. App. 3d at 528, 533 N.E.2d at 966. In that case, counterplaintiff sought rescission of a contract to purchase a company based in part on the seller's misrepresentations of the value of its assets. *Puskar*, 179 Ill. App. 3d at 526, 533 N.E.2d at 965. In affirming the trial court's award of rescission, the reviewing court held that the trial court correctly ordered the counterplaintiff to return the rental value of the company's premises and equipment used, which were benefits he had received. *Puskar*, 179 Ill. App. 3d at 528, 533 N.E.2d at 966; see also *Felde v. Chrysler Credit Corp.*, 219 Ill. App. 3d 530, 541-42, 580 N.E.2d 191, 199-200 (1991) (reviewing court ordered a setoff against plaintiff's award for the benefit of driving the car purchased under the contract being rescinded).

In this case, Prime Petroleum's tax returns report plaintiff's share of the company's income in 2003 as 33.33% of $422, which is $141; and in 2004, plaintiff's share is reported as 33.33% of $42,403, which is $14,133. Defendants correctly note that plaintiff received the benefit of $14,274 during those years under the agreement with defendants, and plaintiff does

-43-

not dispute that fact. Such evidence is sufficient to support the conclusion that the trial court improperly denied defendants the return of the profits received by plaintiff in the amount of $14,274. *Puskar*, 179 Ill. App. 3d at 528, 533 N.E.2d at 966. Accordingly, pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we further reduce the judgment amount by $14,274. See *Felde*, 219 Ill. App. 3d at 542, 580 N.E.2d at 200.

On cross-appeal, plaintiff contends that the trial court's denial of leave to amend his complaint to conform the pleadings to the proofs pursuant to section 2-616 of the Illinois Code of Civil Procedure (735 ILCS 5/2-616 (West 2008)) was an abuse of discretion. Plaintiff's proposed amended complaint added Siddiqui as a defendant on count I, which was the court for fraud. Plaintiff maintains the factual findings by the trial court supported a finding of fraud against both defendants Yusuf and Siddiqui, and that judgment on count I was entered against both defendants, even though only Yusuf was named a defendant on that count. Plaintiff's contention lacks merit because he had the opportunity to name Siddiqui as an additional defendant for fraud before the court entered its final judgment.

The Illinois Code of Civil Procedure (Code) provides, in pertinent part:

"New parties may be added and parties misjoined may be dropped by order of the court, at any stage of the cause, before or after judgment, as the ends of justice may require and on terms which the court may fix." 735 ILCS 5/2-407 (West 2009).

In addition, after a final judgment, a party may amend pleadings only to conform the pleadings to the proofs as provided under section 2-616 of the Code. *Mandel v. Hernandez*, 404 Ill. App. 3d 701, 707, 936 N.E.2d 1079, 1085 (2010). Under that provision,

"A pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuances that may be just." 735 ILCS 5/2-616(c) (West 2009).

While this court generally encourages a liberal construction of section 2-616 as applied to prejudgment motions, it has recognized a separate discretionary standard for allowing amendments after a final judgment. *Mandel*, 404 Ill. App. 3d at 707-08, 936 N.E.2d at 1085. In that case, where plaintiff filed a motion to amend his complaint after judgment, the court noted that courts consider certain factors in determining whether a court properly ruled on a motion to amend, such as whether the amendment would cure the defective pleading, whether it would cause prejudice to other parties, and whether it is timely. *Mandel*, 404 Ill. App. 3d at 708, 936 N.E.2d at 1085. However, the court then found that those factors are not applicable to motions to amend filed after judgment, and that even if they were applicable, plaintiff would not prevail where she had opportunities to amend her complaint prior to final judgment. *Mandel*, 404 Ill. App. 3d at 708-09, 936 N.E.2d at 1085. The court reasoned that a motion under section 2-616(c) is "improper where, after judgment, the moving party seeks to add claims or causes of action that were available at the time of the original complaint." *Mandel*, 404 Ill. App. 3d at 708, 936 N.E.2d at 1085; see also *Kolacki v. Verink*, 384 Ill. App. 3d 674, 681, 893 N.E.2d 717, 724-25 (2008) (court did not abuse its discretion in denying plaintiff leave to amend her complaint and name a new party as an additional defendant after the case had been dismissed).

In this case, the trial court entered a final judgment on August 21, 2009, and plaintiff filed his motion to amend his complaint on October 6, 2009. In that motion, plaintiff sought to name Siddiqui as an additional defendant on the count of fraud, whose role in the transaction

was known to plaintiff during the proceedings and plaintiff had the opportunity to amend the complaint prior to final judgment. Plaintiff's reliance on *Cross v. Ainsworth Seed Co.*, 199 Ill. App. 3d 910, 557 N.E.2d 906 (1990), is misplaced because in that case, the moving party filed a motion to amend his complaint before a final judgment was entered. Accordingly, we find that the trial court's denial of leave for plaintiff to amend his complaint was not an abuse of discretion. *Mandel*, 404 Ill. App. 3d at 708-09, 936 N.E.2d at 1085-86.

Plaintiff further contends that the trial court's "self-reversal" with respect to Siddiqui's fraud does not permit meaningful review on appeal and requires remand. He argues that the trial court's order on November 23, 2009, finding that defendant Siddiqui did not commit fraud was a reversal of its previous ruling, and because it was entered without an explanation, it should be reversed and remanded for further proceedings.

We note that it is a well-established principle that when an appeal is taken from a judgment of a lower court, " 'the question before the reviewing court is the correctness of the result reached by the lower court, and not the correctness of the reasoning upon which that result was reached.' " *Johnson*, 208 Ill. 2d at 128, 803 N.E.2d at 449 (quoting *People v. Novak*, 163 Ill. 2d 93, 101, 643 N.E.2d 762, 767 (1994)). In *Johnson*, 208 Ill. 2d at 131-32, 803 N.E.2d at 450-51, our supreme court held that the appellate court properly affirmed a decision of the trial court to suppress certain evidence, even though the appellate court based its decision on a different rationale than that relied on by the trial court. In doing so, the supreme court noted that a reviewing court " 'can sustain a decision of a lower court for any appropriate reason, regardless of whether the lower court relied on those grounds and regardless of whether the lower court's

reasoning was correct.' " *Johnson*, 208 Ill. 2d at 129, 803 N.E.2d at 449 (quoting *Novak*, 163 Ill. 2d at 101, 643 N.E.2d at 767).

Here, in the trial court's ruling entered on August 21, 2009, the court noted that plaintiff's claim for fraud (count I) was against Yusuf, and that his claim for breach of contract (count III) was against both Yusuf and Siddiqui. The court later found that plaintiff had established his claim for fraud, noting that plaintiff was justified on relying on Yusuf's misrepresentations. It later found that both defendants breached their oral contract with plaintiff. When ruling on plaintiff's remedy, the court found that "[p]laintiff is entitled to rescission and the return of the money paid to the [d]efendants."

In its order entered on November 23, 2009, the court amended its previous order entered on August 21, 2009, in that the court found that Siddiqui did not commit fraud, and no judgment was entered against him on that count. Although the court did not provide its rationale for its ruling, it is evident from the record that the court's judgment in count I did not include Siddiqui. There is sufficient evidence in the record to sustain the finding that plaintiff knew of Siddiqui's role in the parties' venture throughout the proceedings, had the opportunity to amend his complaint before the trial court entered its final judgment, and failed to do so. Accordingly, we conclude that the trial court's order on November 23, 2009, clarifying its previous ruling was sustained by sufficient evidence in the record, and does not require reversal and remand for further proceedings.

Affirmed in part, and reversed in part.

HOWSE, J., and EPSTEIN, J., concur.