2017 IL App (3d) 160162

Opinion filed April 5, 2017

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2017

| | | |
|---|---|---|
| EMIL BENZAKRY and EMIL AND SON, LLC, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Whiteside County, Illinois. |
| Plaintiffs-Appellees and Cross-Appellants, | ) ) ) | |
| v. | ) ) | Appeal No. 3-16-0162 Circuit No. 07LM128 |
| PARESH PATEL and KALPITA PATEL, | ) ) ) | The Honorable |
| Defendants-Appellants and Cross-Appellees. | ) ) | John L. Hauptman, Judge, presiding. |

JUSTICE McDADE delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justice Schmidt concurred in the judgment and opinion.

**OPINION**

¶ 1         Plaintiff Emil Benzakry, through his company Emil & Son, LLC, entered into a purchase agreement with defendants Paresh and Kalpita Patel, through their company KAP Family Investments, LLC, to purchase a gas station in Rock Falls, Illinois. The gas station closed, and Benzakry sued for damages. A judgment was entered in favor of Benzakry. Defendants appealed, arguing (1) a claim for veil piercing cannot be tried before a jury, (2) the trial court abused its discretion by allowing the introduction of bank statements without proper foundation,

(3) plaintiffs cannot prove fraud because Paresh did not proximately cause Benzakry's damages, (4) plaintiffs cannot prove fraud because Benzakry did not justifiably rely on Paresh's alleged misrepresentations, and (5) the corporate veil judgment against Kalpita was against the manifest weight of the evidence. Benzakry cross-appealed, arguing (1) the trial court's grant of defendant's motion for a directed verdict was error because plaintiffs are allowed to sue under the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act or Act) (815 ILCS 505/1 *et seq.* (West 2006)) and (2) the trial court's denial of plaintiffs' motion to amend a complaint to conform the pleadings to the proofs was error because there was evidence of a principal-agent relationship. We affirm in part and reverse in part, and the cause is remanded for further proceedings.

¶ 2                                    FACTS

¶ 3        The following facts are undisputed. Plaintiff Benzakry owned multiple businesses in California throughout his career. In 2005, Benzakry sold his last business and started looking on LoopNet[1] for investments to assist him with his living expenses during his retirement. Benzakry came across an advertisement on the LoopNet site that stated the following:

> "*********TRIPLE    NNN    LEASE[2]**********GAS
> STATION LOCATED IN ROCK FALLS, IL*******Please call
> for actual location*********** Located on a Major exit on the
> State   Highway.   Surrounded   by   Fast   Food   restaurants   like
> McDonald's, Arby's[,] Burger King, Subway. 1 Million Gallon

---

[1]Benzakry testified that LoopNet is "an Internet, commercial Internet, it sells, all sorts of commercials with caps, which is like you can buy McDonald or you can buy a dollar, Family Dollar, or they, they don't own their buildings, what they, they really do is that they pay you rent. You buy them, then you, you pay rent."

[2]Benzakry testified that NNN lease means "you do nothing. You sit at home and collect money. That's called an armchair investment."

plus annual sale!!!!!!!!!! $300,000 inside C-store sales!!!!! EPA

CLEAN PHASE I conducted!!!!!! 13% CAP RATE!!!!!"

¶ 4            "K. Patel" was listed in the advertisement as the contact person for inquires, and after several months, Benzakry called the phone number listed. In January 2007, David Levin, a realtor, e-mailed Paresh the following information:

"I just visited with Emil and he has just some basic questions which he is going to write up and send to me. I will forward to you for your response. The one that has him more worried about any is this:

Who is Singh & Singh LLC? We see no evidence of a personal guarantee so if the businesses goes bad, what leverage does the owner of the Fee have? They seem to have taken your word that everything is good. Some history on the Tenant will be relevant.

He would feel more comfortable with a Personal Guarantee and some history of who this gentleman or gentlemen are."

Paresh responded with Benzakry copied on the e-mail, stating:

"Singh & Singh LLC is owned by the former manager of my gas station. He has over 10 years of experience in managing gas stations. He was operating the Rock Falls, IL[,] gas station ever since I bought it in 2005. He also managed my other store in Le Claire, IA and in Chicago. I personally know him for the last 8

3

years. Since I knew him personally, I did not ask for a Personal Guarantee on the rental payments in the purchase agreement."

Benzakry received a copy of the lease agreement between Singh & Singh, LLC, and KAP [3] and of the Singhs' personal financial statements for his review. On January 12, 2007, Benzakry, through his company Emil & Son, entered into a purchase agreement and addendum for the Rock Falls gas station for $521,500. Benzakry was to receive $6000 per month in rent.

¶ 5        On January 24, Benzakry e-mailed Paresh with questions regarding the purchase of the gas station, and Paresh responded, providing his answers below Benzakry's questions:

> "1) who is SING & SING LLC. SINGH & SINGH, LLC is the Tenant of KAP Family Investments, LLC (my corporation). KAP Family Investments, LLC owns the Land, & Building at Rock Falls, IL and SINGH & SINGH, LLC signed a 15 years NNN lease to operate the Gas Station.
>
> ***
>
> 3) according to information David and I received is that SING & SING LLC. operates another two gas stations, we have no evidence of that. SINGH & SINGH, LLC does not operate two gas stations. Mr. Singh was a manager of three gas stations that were owned by me.
>
> ***

---

[3] In December 2006, KAP (Kalpita is the registered agent and sole member of KAP) and Singh & Singh (owned by Christopher and Anita Singh) entered into a lease agreement with respect to the Rock Falls gas station.

5) In what capacity was Mr. sing working for you? Mr. Singh was working as a Manager for the three gas stations that I own.

*\*\**

7) In all leases I have ever seen, there always is a clause mentioning, "the leasee paid first last and security deposit", this lease has no mention of that. As I mentioned earlier in the email that I know Mr. Signh personally for the last 8 years and have worked for me for the last 5 years I did not ask any security deposit from him.

\* \* \*

11) I object to have a tenant with an LLC. Unless he also sign a personal guaranty. I can get a personal guarantee signed from the tenant. Attached is the personal guarantee agreement.

12) Because of the above questions, and uncertainties, which were not clear when we signed our agreement, and because of the leasee no proof of owning other gas stations as presumed earlier, I suggest this course of action, a) a personal guaranty to be added, not a problem.

b) a security deposit and last moth [*sic*] rent to be paid, (1 month rent as security deposit and last month rent for a total of $12,000 is reasonable)."

5

¶ 6          On January 26, a second addendum to the purchase agreement was executed and included the enforcement of a personal guarantee agreement and security deposit of $12,000. The addendum also contained a clause that stated:

> "Entire Agreement. This Addenda and Agreement contain the entire agreement between Seller and Buyer, and there are no other terms, conditions, promises, undertakings, statements *or representations*, either written or oral or expressed or implied, concerning the sale contemplated by this agreement." (Emphasis added.)

¶ 7          In February 2007, Benzakry and KAP closed on the gas station. At the time, a guaranty of lease agreement between KAP and Singh & Singh was signed. The agreement stated the following:

> "1. GUARANTOR jointly, severally and unconditionally guarantees to LESSOR, its successors and assigns, the prompt payment by TENANT of the rents reserved in said LEASE and the performance by TENANT of all provisions and covenants contained in said LEASE for and during the original term of said LEASE and any renewal or renewals, extensions, modifications or amendments thereof; and if any default shall be made by TENANT, GUARANTOR shall pay to LESSOR, its successors or assigns, such sum or sums of money as will be sufficient to make up any such deficiency, and shall satisfy the provisions and covenants by TENANT to be performed."

6

¶ 8        Benzakry received rent for the months of February to April but did not receive rent for the month of May. Benzakry called the station to address this issue, but no one answered. He called David Levin, who went to the gas station and discovered that it was closed. Levin sent pictures of the closed store to Benzakry that depicted an "Out of Gas" sign on the gas tanks and a "Sorry … Closed" sign on the gas station door.

¶ 9        Singh & Singh entered into an agreement with Emil & Son to relinquish possession of the gas station for failure to pay rent. After relinquishment, Benzakry came to Rock Falls, Illinois, where he continued to operate the establishment as a gas station for about a year and a half, after which time Benzakry turned the establishment into a retail store.[4] Ultimately, Whiteside County seized the store due to illegal actions of the store's manager.[5]

¶ 10        On August 28, 2007, Emil & Son filed a complaint against Singh & Singh, Christopher Singh, Anita Singh, and Jane Singh, claiming rent and damages. On April 6, 2009, Christopher and Anita Singh and Benzakry and Emil & Son entered into a consent judgment of nondischargability in the amount of $25,000.

¶ 11        In June 2009, Emil & Son filed an amended complaint adding KAP and Paresh as defendants, claiming breach of contract, deceptive practices, and common-law fraud. Discovery commenced, and the matter was set for trial on March 15, 2011.

¶ 12        Emil & Son filed a motion for default judgment against KAP in March 2011, which the trial court granted and ordered KAP to pay $577,307.45.

---

[4]Benzakry testified that he "tried all sorts of other things there to sell. I tried clothing ***. *** They go to Walmart to buy whatever I sell so that didn't work out" and that "I turned it into a check Western Union—what do you call it—agency. And I turned it into a smoke shop."

[5]At trial, Benzakry was asked, "Was she dealing drugs out of that store?" and Benzakry answered, "She was."

¶ 13    In February 2013, Emil & Son filed a third amended complaint adding Kalpita as a defendant, claiming breach of contract, deceptive practices, and common-law fraud. Another amended complaint was filed in July 2013, adding Benzakry as plaintiff.

¶ 14    At trial, Benzakry testified that the financial strength of the tenant was important in his determination to enter into the purchase agreement. Furthermore, he testified that after he received the Singh & Singh lease and was assured about the tenant's ability to pay rent by Paresh, Benzakry entered into the purchase agreement with KAP.

¶ 15    Paresh acknowledged that Benzakry was interested in a triple net lease and the financial strength of the tenant when Benzakry inquired about the gas station. He admitted that Christopher Singh had not operated the Rock Falls gas station since 2005, Paresh never owned a gas station in Chicago, and Paresh had not known Christopher Singh for eight years but rather eight months. Also, Paresh admitted that the annual sale of a million gallons of gas and $300,000 of convenience store sales were not the actual but projected figures of the gas station. Paresh further admitted that the figures were not identified as projected in the advertisement.

¶ 16    Christopher Singh testified that Singh & Singh signed a lease to the Rock Falls gas station with KAP in 2007. At the time, he had never managed a gas station, he had not known Paresh for eight years, and he had not worked for Paresh for five years. When he started managing the gas station, he was told that the rent would come out of the profits from the gas station. After two to three months, Singh realized he was not making enough money from the gas station to pay rent and told Paresh about the financial issues. Moreover, Singh testified that Paresh provided him the figures listed in the financial statement given to Benzakry.

¶ 17    Kalpita testified that she and her friend Anjali Agarwel formed KAP. Kalpita could not recall how much money she invested in KAP at the time of formation. Eventually, Kalpita

8

bought Agarwel's share in KAP and became sole owner. She was not involved in the day-to-day transactions of KAP: "Honestly, this is all day-to-day transactions and my manager, that would be my husband, he used to look after all of this. I can request you ask him and he can answer you better. I mean I have no clue because I was not involved in day-to-day transactions, no." Kalpita admitted that she transferred funds in the amount of $8500, $31,000, and $40,000 to her other business, Mississippi Marketplace, transferred personal funds into an Amcore Bank account, and transferred money to Guy Culvert, a horse trainer. When asked why payments from the Amcore Bank account were made to the Patels' horse trainer, Kalpita responded, "Okay. So—I don't know how to answer this but, if you are having multiple businesses, as a business woman, I will rotate my money to survive, or—I just said, you know, financially you just ask Mr. Paresh Patel[;] he will answer anything." Also, Kalpita testified that she did not have any corporate records because her husband maintained the records.

¶ 18        Defendants filed a motion for summary judgment as to counts III (breach of contract against Paresh), V (common-law fraud against Paresh), IX (breach of contract against Kalpita), and XI (common-law fraud against Kalpita), as well as a motion to dismiss counts IV (Consumer Fraud Act claim against Paresh) and X (Consumer Fraud Act claim against Kalpita). The trial court denied defendants' motion to dismiss but granted defendants' motion for summary judgment as to counts III and IX.

¶ 19        Plaintiffs filed a fourth amended complaint that added an amended count XII, which sought a piercing of the corporate veil and holding Kalpita personally liable for the debts of KAP.

¶ 20        Defendants filed a motion for a directed verdict and a combined motion for judgment notwithstanding the verdict, renewed motion for a directed verdict, and motion for new trial, all

of which the trial court denied. Plaintiffs filed a motion to conform the pleadings to the proofs to add a principal-agent claim against Kalpita, which the trial court denied.

¶ 21 The jury found in favor of plaintiffs on counts V (common-law fraud) and XII (piercing the corporate veil), awarded plaintiffs $700,000 in damages, and found Kalpita personally responsible for the debts of KAP. This appeal followed.

¶ 22                                                 ANALYSIS

¶ 23                                                 I. Appeal

¶ 24                                          A. Corporate Veil Claim

¶ 25 Defendants first argue that the issue of piercing the corporate veil of KAP is for the court to decide, not the jury. Also, because the jury heard the corporate veil claim, the jury was presented substantial evidence that was completely irrelevant to the fraud claim. Thus, the corporate veil and fraud claims should be reversed and remanded for a retrial. Plaintiffs argue that, although Illinois courts have not addressed this issue, there are cases that support the proposition that the issue of piercing the corporate veil is a matter for the jury to decide. In the alternative, plaintiffs claim case law supports the proposition that courts can treat the jury's decision as advisory and decide whether veil piercing would be appropriate. This appears to be an issue of first impression, as there are no Illinois cases that discuss this issue.

¶ 26 Defendants failed to preserve this issue for review. *Dempsey v. Sternik*, 147 Ill. App. 3d 571, 580 (1986) (failure to object at the trial level constitutes a waiver unless the failure constitutes fundamental error). The record reveals that defendants did not file a motion to sever the corporate veil claim. In fact, the defendants conceded to the corporate veil claim being tried before a jury when defendants' attorney stated, "No, I mean I'm not too concerned about the

10

point, I want to make life easier." Further, at the hearing on defendants' combined motion, defendants' attorney stated, "let's get to the veil piercing issue. Uhm, we screwed up on it. Uhm, all three of us, I think, screwed up on the veil piercing issue. *I didn't put up much of a fight, you got a case, all right, whatever, you got a case.*" (Emphasis added.) As a result, we find that defendants waived this issue. However, the waiver rule is a limitation on the parties and not on the reviewing court. *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 504-05 (2002). Because this is an issue of first impression, we decline to follow the waiver rule and will address the merits.

¶ 27 The parties have cited various cases to assist in their arguments. Two cases that relate to this case are *FMC Finance Corp. v. Murphree*, 632 F.2d 413 (5th Cir. 1980), and *International Financial Services Corp. v. Chromas Technologies Canada, Inc.*, 356 F.3d 731 (7th Cir. 2004), both of which address whether a corporate veil claim in a diversity case is tried before a court or jury when applying substantive Illinois law and federal procedural law.

¶ 28 In *Murphree*, the Fifth Circuit determined that the issue of piercing the corporate veil is one for the jury. *Murphree*, 632 F.2d at 421 n.5. However, the Seventh Circuit in *Chromas Technologies* decided not to follow the Fifth Circuit's decision because it found that the Fifth Circuit's determination lacked authority to support its assertion. *Chromas Technologies*, 356 F.3d at 738-39. Instead, the Seventh Circuit found that, under Illinois law, piercing the corporate veil is an equitable claim because the theory is only available to remove injustice or *inequity*, the application of the theory is a matter of discretion, and the theory does not always result in money damages. *Id.* at 737. A district court must make an independent judgment as to any equitable issue; therefore, the Seventh Circuit found that, under Illinois law, corporate veil claims are to be determined by the court. *Id.* at 735, 737.

11

¶ 29      Although these cases provide guidance, they are restricted to the application of federal procedural law. Therefore, it is important to look to Illinois substantive law and any applicable Illinois procedural law to assist in this analysis.

¶ 30      Illinois courts have established that corporate veil claims are equitable in nature. *Buckley v. Abuzir*, 2014 IL App (1st) 130469, ¶ 29 (discussing *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491 (2005), and noting that a corporate veil claim is an equitable remedy); *Fontana*, 362 Ill. App. 3d at 500 (" '[t]he doctrine of piercing the corporate veil is an equitable remedy' " (quoting *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 527 (2002)), and *In re Rehabilitation of Centaur Insurance Co.*, 238 Ill. App. 3d 292, 300 (1992) ("[t]he doctrine of 'piercing the corporate veil' is an equitable remedy" (citing *Tilley v. Shippee*, 12 Ill. 2d 616, 623 (1958)).

¶ 31      Also, it is well established in Illinois that there is no right to a jury trial in equitable claims. *Lazarus v. Village of Northbrook*, 31 Ill. 2d 146, 148 (1964) ("There was then and there is now no constitutional right of trial by jury in equity."); *Martin v. Strubel*, 367 Ill. 21, 22-23 (1937) ("[i]n this State the guaranty of the right to a jury trial does not extend to cases of equity jurisdiction"); *Cooper v. Williams*, 60 Ill. App. 3d 634, 635 (1978) ("Except in certain statutorily enumerated situations, the constitutional guaranty of a jury trial applies only to actions known to the common law and is not a matter of right in equity proceedings.").

¶ 32      However, in Illinois, the trial court does have discretion to direct equitable claims to be heard by a jury. Section 2-1111 of the Code of Civil Procedure states, "The court may in its discretion direct an issue or issues to be tried by a jury, whenever it is judged necessary in any action seeking equitable relief." 735 ILCS 5/2-1111 (West 2014). Our court has applied this Illinois procedure. *Kjellesvik v. Shannon*, 41 Ill. App. 3d 674, 678 (1976) ("the granting of a jury trial in equity cases is discretionary with the trial court").

¶ 33　　　　　Here, the record shows that the parties presented arguments on the issue of trying the corporate veil claim before the jury. The trial court stated that it would consider the parties' arguments and supporting case law and decide whether the claim will be heard before a jury. Afterward, the claim was heard before the jury without objection. In light of the circumstances, the trial court exercised its discretion to bring the corporate veil claim before the jury. Therefore, we find the corporate veil claim was properly tried before a jury pursuant to section 2-1111.

¶ 34　　　　　　　　　　　　B. Business Records Exception

¶ 35　　　　　Defendants argue the court abused its discretion by admitting computer-generated bank records of an account held by KAP without foundation as required by Illinois Rule of Evidence 803(6) (eff. Apr. 26, 2012) and Illinois Supreme Court Rule 236 (eff. Aug. 1, 1992).

¶ 36　　　　　Rule 803(6) is applicable in both criminal and civil cases. It states:

> "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> (6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation * * *."
> Ill. R. Evid. 803(6) (eff. Apr. 26, 2012).

13

¶ 37        Rule 236 applies exclusively to civil cases. It states:

> "Any writing or record, whether in the form of any entry in a book
> or otherwise, made as a memorandum or record of any act,
> transaction, occurrence, or event, shall be admissible as evidence
> of the act, transaction, occurrence, or event, if made in the regular
> course of any business, and if it was the regular course of the
> business to make such a memorandum or record at the time of such
> an act, transaction, occurrence, or event or within a reasonable
> time thereafter. All other circumstances of the making of the
> writing or record, including lack of personal knowledge by the
> entrant or maker, may be shown to affect its weight, but shall not
> affect its admissibility. The term 'business,' as used in this rule,
> includes business, profession, occupation, and calling of every
> kind." Ill. S. Ct. R. 236 (eff. Aug. 1, 1992).

¶ 38        For computer-generated records, a party must establish " 'the equipment which produced the record is recognized as standard, the entries were made in the regular course of business at or reasonably near the happening of the event recorded and the sources of information, method and time of preparation were such as to indicate their trustworthiness and to justify their admission.' " *US Bank, National Ass'n v. Avdic*, 2014 IL App (1st) 121759, ¶ 25 (quoting *Riley v. Jones Brothers Construction Co.*, 198 Ill. App. 3d 822, 829 (1990)). The standard for determining whether records are admissible as business records is abuse of discretion. *Id.*

¶ 39        The business record exception requires evidence related to the document's creation. See *Apa v. National Bank of Commerce*, 374 Ill. App. 3d 1082 (2007). In *Apa*, the defendant argued

14

that the plaintiff did not lay a proper foundation for a bank statement needed to meet the business records exception. *Id.* at 1085-86. Noting that mere retention, without evidence of the document's creation, does not meet the business records exception, the First District determined that plaintiff did not lay a proper foundation for the exception. *Id.* at 1088. Specifically, plaintiff only testified to keeping the records in the regular course of business and did not testify to the document's creation. *Id.* "Without proper authentication and identification of the document, the proponent of the evidence has not provided a proper foundation and the document cannot be admitted into evidence." (Internal quotation marks omitted.) *Id.*

¶ 40     As in *Apa*, there is no evidence in the record of the instant case that shows the bank statements were made in the regular course of business. Specifically, there is no evidence, through testimony or affidavit, of the bank statement's creation. Furthermore, there is no evidence in the record, through testimony or affidavit, that shows it was regular practice for Paresh to keep KAP's bank statements. Therefore, plaintiffs did not meet the business records exception requirements. See Ill. S. Ct. R. 236 (eff. Aug. 1, 1992); *Apa*, 374 Ill. App. 3d at 1088.

¶ 41     In their brief, defendants mentioned a possible admission of the bank statements under the recorded recollection exception. The requirements for the recorded recollection exception are:

> "(1) the witness had firsthand knowledge of the recorded event;
>
> (2) the written statement was made at or near the time of the event and while the witness had a clear and accurate memory of it;
>
> (3) the witness lacks present recollection of the event; and (4) the witness can vouch for the accuracy of the written statement."

15

(Internal quotation marks omitted.) *Kociscak v. Kelly*, 2011 IL App (1st) 102811, ¶ 26.

See Ill. R. Evid. 803(5) (eff. Apr. 26, 2012).

¶ 42    However, for the same reasons stated above, defendant does not provide any evidence to show that Paresh could attest to the accuracy of the bank statements. Thus, the plaintiffs did not meet the requirements of the recorded recollection exception. See Ill. R. Evid. 803(5) (eff. Apr. 26, 2012).

¶ 43    The trial court's error in admitting the bank statements without proper foundation will not be overturned if the error was harmless. *Lorenz v. Pledge*, 2014 IL App (3d) 130137, ¶ 18 ("Where a trial court abuses its discretion in admitting evidence, a reviewing court should grant a new trial only where the error was substantially prejudicial and affected the outcome of the case." (Internal quotation marks omitted.)).

¶ 44    Although the bank records were relevant to the corporate veil claim, Paresh's testimony was cumulative. Paresh was cross-examined regarding the issue of commingling funds as evidenced in the bank statements. Kalpita also testified to the commingling of funds seen in the same bank statements without objection on the foundation. We believe defendants were not prejudiced, and therefore, the trial court's error was harmless.

¶ 45                    C. Proximate Result in Fraud Claim

¶ 46    Defendants argue that plaintiffs failed to present evidence that proved plaintiffs suffered damages as a proximate result of Paresh's alleged misrepresentations. Plaintiffs argue that Paresh's misrepresentations regarding Singh & Singh's ability to pay rent were the proximate cause of plaintiffs' lost rental income.

¶ 47 Defendants request that this court review the trial court's denial of defendants' motion for summary judgment or their motion for a directed verdict. "[I]f a motion for summary judgment is improperly denied the error is not reversible for the result becomes merged in the subsequent trial." *Home Indemnity Co. v. Reynolds & Co.*, 38 Ill. App. 2d 358, 367 (1962). Therefore, only the trial court's denial of defendants' motion for directed verdict will be reviewed.

¶ 48 A motion for directed verdict will not be granted unless all of the evidence so overwhelmingly favors the movant that no contrary verdict could stand. *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010). All of the evidence must be construed in the light most favorable to the nonmoving party. *Id.* The standard of review for a motion for a directed verdict is *de novo. Id.*

¶ 49 The elements of fraudulent misrepresentation are: "(1) a false statement or omission of material fact; (2) knowledge or belief of the falsity by the party making it; (3) intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statements; and (5) damage to the other party resulting from such reliance." *Weidner v. Karlin*, 402 Ill. App. 3d 1084, 1087 (2010). "Proximate cause means any cause which, in natural or probable sequence, produced the injury complained of. It need not be the sole cause or the last or nearest cause." *Capiccioni v. Brennan Naperville, Inc.*, 339 Ill. App. 3d 927, 937 (2003). The trial court's finding on a count of fraud will not be disturbed unless it was against the manifest weight of the evidence. *Hassan v. Yusuf*, 408 Ill. App. 3d 327, 350-51 (2011).

¶ 50 Plaintiffs established proximate cause sufficiently to constitute fraud. Benzakry testified that his purpose for purchasing the gas station was to pursue a triple net lease, which allows a purchaser to collect rent from a tenant. Paresh made representations regarding the tenant's reliability and trustworthiness when he made statements to Benzakry regarding his relationship

17

with the tenant in an e-mail. Paresh acknowledged in his testimony that some of the representations were false. Shortly after, the tenant was unable to pay the rent due to financial problems with the gas station. In fact, Christopher Singh testified that he had actually been having trouble paying the rent and had told Paresh about it. Benzakry lost rent profits as a direct result of the tenant's inability to pay the rent. Therefore, we find plaintiffs established proximate cause to constitute fraud.

¶ 51   Also, defendants argue that the jury's verdict was against the manifest weight of the evidence. A jury's findings will not be set aside unless it appears that such findings are clearly or palpably against and contrary to the manifest weight of the evidence. *Izzo v. Zera*, 57 Ill. App. 2d 263, 267 (1965). A verdict cannot be said to be against the manifest weight of the evidence unless an opposite conclusion is clearly evident. *Id.* at 267-68. Based on the information above, we hold that the jury's verdict was not against the manifest weight of the evidence.

¶ 52                              D. Reliance in Fraud Claim

¶ 53   Defendants argue that plaintiffs failed to present any evidence to prove Paresh's alleged false statements were material or that plaintiffs justifiably relied on the alleged false statements. Plaintiffs allege that Benzakry sought a triple net lease for the purpose of collecting rental income and the tenant's ability to pay was important, Paresh made representations about Christopher Singh's ability to pay the rent, and Benzakry relied on Paresh's representations.

¶ 54   As stated above, one of the elements of fraudulent misrepresentation requires that the allegedly aggrieved party justifiably relied on the statements made by the other party. *Weidner*, 402 Ill. App. 3d at 1087. In determining justifiable reliance, courts consider all of the circumstances, including "the parties' relative knowledge of the facts available, opportunity to

18

investigate the facts and prior business experience." *Hassan*, 408 Ill. App. 3d at 350. A party's reliance is justified when defendant has created a "false sense of security or blocked further inquiry, provided that the facts were not such as to put a reasonable person on inquiry." *Id.* Furthermore, "[I]n the absence of circumstances putting a reasonable person on inquiry, that person is justified in relying on a representation without engaging in further inquiry, especially where the misrepresentation concerns matters which may be assumed to be within the knowledge of the party making them." *Id.* at 351. The trial court's finding on a count of fraud will not be disturbed unless it was against the manifest weight of the evidence. *Id.* at 350-51. As stated above, the trial court's denial of defendants' motion for a directed verdict will be reviewed rather than the motion for summary judgment.

¶ 55    Plaintiffs established justifiable reliance sufficiently to constitute fraud. Benzakry testified that his purpose for purchasing the gas station was to pursue a triple net lease, which allowed a purchaser to collect rent from a tenant. Paresh made representations regarding the tenant's financial reliability and trustworthiness when he made statements regarding his relationship with the tenant to Benzakry in an e-mail. Paresh acknowledged in his testimony that some of the representations were false. Benzakry relied on the misrepresentations because he testified that the reliability of the tenant was important to his decision to purchase a gas station under a net lease. Furthermore, Benzakry testified that the sole purpose of a net lease is for the purchaser to collect rent on the property. Therefore, we determine Benzakry justifiably relied on Paresh's misrepresentations.

¶ 56    Also, defendants argue that the jury's verdict was against the manifest weight of the evidence. A jury's findings will not be set aside unless it appears that such findings are clearly or palpably against and contrary to the manifest weight of the evidence. *Izzo v. Zera*, 57 Ill. App. 2d

19

263, 267 (1965). A verdict cannot be said to be against the manifest weight of the evidence unless an opposite conclusion is clearly evident. *Id.* at 267-68. Based on the foregoing analysis on this issue, we find the jury's verdict was not against the manifest weight of the evidence.

¶ 57     Defendants further argue that plaintiffs cannot rely on any representations that are not in the purchase agreement because plaintiffs signed a nonreliance agreement. Plaintiffs claim the addendum is a standard merger or integration clause, not a nonreliance clause.

¶ 58     *Benson v. Stafford*, 407 Ill. App. 3d 902 (2010), provides guidance in determining whether the parties' agreement contained a nonreliance clause. In *Benson*, defendants argued that a nonreliance clause in the parties' agreement defeated plaintiff's claim of reliance. *Id.* at 921. The clause stated, in relevant part:

> " '*No reliance is placed on any warranty, representation*, opinion, advice or *assertion of fact* made either prior to, contemporaneous with, or after entering into this Agreement, or any amendment or supplement thereto, by any Party or its directors, officers, employees or agents, to any other Party or its directors, officers, employees or agents, except to the extent that the same has been reduced to writing and included as a term of this Agreement ***.' " (Emphasis added.) *Id.* at 909.

¶ 59     The First District ruled that the language in the agreement constituted a nonreliance clause. The court distinguished *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154 (1986), noting that the clause in *Zimmerman* did not contain nonreliance language that existed in the *Benson* case. *Benson*, 407 Ill. App. 3d at 927; *Zimmerman*, 156 Ill. App. 3d at 159 ("neither the Seller, broker nor any of their agents have made representations with respect to any material

20

fact relating to the real estate, its improvements and included personal property unless such representations are in writing"). The court found, *inter alia*, that language describing a party's agreement not to rely on any representations determined the existence of a nonreliance clause. *Benson*, 407 Ill. App. 3d at 927. In other words, *Benson* held that a nonreliance clause requires inclusion of specific nonreliance language. *Id.*

¶ 60        In this case, there was no nonreliance language in the clause contained in the parties' sales agreement. In fact, there is no mention of the word "reliance" or any associated term in the clause. Thus, there is no nonreliance clause in the agreement. Accordingly, we hold the parties' agreement does not defeat plaintiffs' fraud claim.

¶ 61                              E. Corporate Veil Judgment Against Kalpita Patel

¶ 62        Defendants argue plaintiffs provided no evidence to justify piercing the corporate veil of KAP and holding Kalpita personally liable for KAP's default judgment.

¶ 63        A jury's findings will not be set aside unless it appears that such findings are clearly or palpably against and contrary to the manifest weight of the evidence. *Izzo v. Zera*, 57 Ill. App. 2d 263, 267 (1965). A verdict cannot be said to be against the manifest weight of the evidence unless an opposite conclusion is clearly evident. *Id.* at 267-68.

¶ 64        A corporation exists separate and distinct from its shareholders, directors, and officers. *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 278 Ill. App. 3d 1084, 1088 (1996). Generally, the shareholders, directors, and officers are not liable for the corporation's obligations. *Id.* The requirements for piercing the corporate veil and holding a shareholder responsible for the corporation's obligations are "(1) a unity of interest and ownership that causes the separate personalities of the corporation and the individual to no longer exist; and (2) the presence of

21

circumstances under which adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice or promote inequitable consequences." *Id.*

¶ 65 "Courts are reluctant to pierce the corporate veil." *Id.* Accordingly, a party seeking to pierce the corporate veil has the burden to make a substantial showing that the shareholder is not acting separately and distinctly from the corporation. *Id.* Courts look at various factors in determining whether to pierce the corporate veil, including inadequate capitalization, failure to issue stock, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation, nonfunctioning of the other officers or directors, absence of corporate records, commingling of funds, diversion of assets from the corporation by or to a shareholder, failure to maintain arm's length relationships among related entities, and whether the corporation is a mere facade for the operation of the dominant shareholders. *Id.*

¶ 66 The record discloses that KAP had inadequate capitalization. Singh & Singh signed a lease with KAP in December 2006. By March 2007, KAP was having financial issues because it had made several insufficient fund transactions and the Patels were transferring money into the KAP account, including $17,000 of Paresh's money to KAP in April 2007. It is inequitable for shareholders to establish and maintain a corporation that carries on business without sufficient assets available to meet its debt. See *Stap v. Chicago Aces Tennis Team, Inc.*, 63 Ill. App. 3d 23, 28-29 (1978) (citing Henry Winthrop Ballantine, Ballantine on Corporations 302-03 (rev. ed. 1946)).

¶ 67 Also, the record shows that Kalpita was a nonfunctioning shareholder. Specifically, Kalpita was the sole member of KAP, but her testimony indicates that she was not involved with the activities of KAP. Kalpita testified that she trusted her husband to handle the finances in the business. When asked about the Amcore Bank statements, Kalpita responded, "Honestly, this is

22

all day-to-day transaction and my manager, that would be my husband, he used to look after all of this. I can request you ask him and he can answer you better. I mean I have no clue because I was not involved in day-to-day transaction, so."

¶ 68    Lastly, the record shows Kalpita commingled funds. Transactions in the bank statements show money being transferred to the Patels' horse farm. When asked, "Do you know why the gas station account was paying the horse trainer?" Kalpita responded, "Okay. So—I don't know how to answer this but, if you are having multiple businesses, as a businesswoman I will rotate my money to survive, or—I just said, you know, financially you just ask Mr. Paresh Patel[;] he will answer anything." There were also funds in the amount of $8500, $40,000, and $31,000 transferred between the KAP account and the Patels' other gas station in Le Claire, Iowa, where Kalpita was the sole shareholder.

¶ 69    Based on this information, we determine the jury's verdict, piercing KAP's corporate veil and holding Kalpita liable for KAP's damages, was not against the manifest weight of the evidence.

¶ 70                                 II. Cross-Appeal

¶ 71                           A. Consumer Fraud Act Counts

¶ 72    Plaintiffs argue that the trial court erred when it granted defendants' motion for a directed verdict as to counts IV (Consumer Fraud Act claim against Paresh) and X (Consumer Fraud Act claim against Kalpita). Specifically, plaintiffs claim that they do not have to prove a misrepresentation involves trade practices addressed to the market generally as once implicated in case law because the 1990 amendment to section 10(a) of the Consumer Fraud Act (Pub. Act 86-801, § 1 (eff. Jan. 1, 1990) (amending 815 ILCS 505/10a (West 1990)) states "proof of public

23

injury, a pattern, or an effect on consumers generally *shall not* be required." (Emphasis added.) Pub. Act 86-801, § 1 (eff. Jan. 1, 1990).

¶ 73    The parties dispute whether a misrepresentation must involve trade practices addressed to the market generally pursuant to section 10a of the Consumer Fraud Act. 815 ILCS 505/10a (West 2006). This is an issue of statutory interpretation and is reviewed *de novo. Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 6 (2009).

¶ 74    The fundamental rule of statutory interpretation is to ascertain and give effect to the intent of the legislature. *Ryan v. Board of Trustees of the General Assembly Retirement System*, 236 Ill. 2d 315, 319 (2010). The most reliable indicator of that intent is the language of the statute itself. *Id.* In determining the plain meaning of statutory language, a court will consider the statute in its entirety, the subject the statute addresses, and the apparent intent of the legislature in enacting the statute. *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009). If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory interpretation. *Hendricks v. Board of Trustees of the Police Pension Fund*, 2015 IL App (3d) 140858, ¶ 14.

¶ 75    Section 10a states:

> "Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper; provided, however, that no award of punitive damages may be assessed under this Section against a party defendant who is a new vehicle dealer or used vehicle dealer within the meaning of

24

Chapter 5 of the Illinois Vehicle Code or who is the holder of a retail installment contract within the meaning of Section 2.12 of the Motor Vehicle Retail Installment Sales Act, unless the conduct engaged in was willful or intentional and done with evil motive or reckless indifference to the rights of others. *Proof of a public injury, a pattern, or an effect on consumers and the public interest generally shall be required in order to state a cause of action under this Section against a party defendant who is a new vehicle dealer or used vehicle dealer within the meaning of Chapter 5 of the Illinois Vehicle Code* or who is the holder of a retail installment contract within the meaning of Section 2.12 of the Motor Vehicle Retail Installment Sales Act." (Emphasis added.) 815 ILCS 505/10a (West 2006).

¶ 76    The statement "[p]roof of a public injury, a pattern, or an effect on consumers generally shall not be required" was added to the statute through Public Act 86-801 (eff. Jan. 1, 1990), but the legislature removed the word "not" in Public Act 89-144 (eff. Jan. 1, 1996) and made "proof of a public injury, a pattern, or an effect on consumers and the public interest generally" required in cases against new or used vehicle dealers.

¶ 77    It seems that when the language was moved, the legislature did not intend to require that a party show proof of public injury generally but added the language further in the paragraph to place emphasis on the requirement to show public injury only in cases against a defendant who is a new or used vehicle dealer. See *Grimaldi v. Webb*, 282 Ill. App. 3d 174, 182 (1996) ("This amendment is clearly a change in the law, not a mere clarification, as it is specifically carving

25

out actions against vehicle dealers from the rule that proof of public injury or a pattern is not required."). To insinuate that the legislature now placed a general requirement to show proof of public injury would be departing from the language of the statute, which cannot be done. See *Ryan v. Board of Trustees of the General Assembly Retirement System*, 236 Ill. 2d 315, 319 (2010) ("[w]here the statutory language is clear and unambiguous, we will enforce it as written and will not read into it exceptions, conditions, or limitations that the legislature did not express"). Therefore, we find the 1996 amendment did not change the meaning of section 10a, and thus, no public injury needs to be proven.

¶ 78     Regardless, we note that there is evidence of public injury because Paresh misrepresented the gasoline and convenience store sales in the advertisement. Paresh placed an advertisement for the purchase of a triple net lease for the gas station on a website accessed by the general public. At trial, Paresh admitted that the annual sale of a million gallons of gas and $300,000 of convenience store sales stated in the advertisement were not actual but projected figures and that he did not disclose that the figures were projected in the advertisement.

¶ 79     Also, defendants argue that plaintiffs cannot bring a suit under the Consumer Fraud Act because defendants do not meet the statutory definitions of "merchandise" and "consumer" under the Consumer Fraud Act.

¶ 80     The Consumer Fraud Act allows purchasers of real estate to bring a claim before the court. In *Beard v. Gress*, 90 Ill. App. 3d 622, 627 (1980), the Fourth District addressed the issue of whether a domestic purchaser of real estate had standing to sue under the Consumer Fraud Act. The court stated that prior to 1973, section 2 of the Consumer Fraud Act was limited to the sale and advertisement of merchandise. *Id.* However, after 1973, the General Assembly added the words "trade" and "commerce" to the Act, which broaden the protection "beyond matters

26

connected with the sale or advertisement of merchandise to the conduct of any trade or commerce." *Id.* Furthermore, the Act added the word "businessman," which created an additional protected group. Because of this, the Fourth District concluded that section 2 also protected purchasers of real estate to sue for violations even though they do not meet the definition of "consumer" under the Consumer Fraud Act. "Any other interpretation would give the obviously unintended result of protecting businessmen who purchase real estate but giving no such protection to other citizens who do so." Thus, we hold plaintiffs can bring a claim against defendants under the Consumer Fraud Act without meeting statutory definitions of "merchandise" and "consumer."

¶ 81    Next, we determine whether plaintiffs are entitled to judgment under the Consumer Fraud Act. Section 2 of the Consumer Fraud Act states unfair or deceptive acts or practices, including fraud and misrepresentation, are a violation of the Act. 815 ILCS 505/2 (West 2006). To prove deceptive acts or practices, a party must show "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that plaintiff rely on the deception, (3) the occurrence of the deception during a course of conduct involving trade or commerce, (4) actual damage to the plaintiff [and] (5) proximately caused by the deception." *Ramirez v. Smart Corp.*, 371 Ill. App. 3d 797, 806 (2007) (citing *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 180 (2005)).

¶ 82    We believe defendants engaged in deceptive acts when they knowingly misrepresented information in their advertisement and in their e-mails to Benzakry as stated in detail above. See *Siegel v. Levy Organization Development Co.*, 153 Ill. 2d 534, 543 (1992) ("it is unquestionable that so long as the alleged deception occurred in a course of conduct involving trade or commerce, facts satisfying a claim for common law fraud will necessarily satisfy a claim under

27

the [Consumer Fraud] Act"). Therefore, we grant judgment on counts IV and X in favor of plaintiffs and against defendants. Plaintiffs request that this claim be remanded for the sole purpose of assessing attorney fees. Section 10a of the Consumer Fraud Act grants the trial court discretion to award damages that the court deems proper. 815 ILCS 505/10a (West 2006). Because plaintiffs are eligible for attorney fees, the trial court has the discretion to award attorney fees on remand.

¶ 83                              B. Motion to Conform Pleadings to the Proofs

¶ 84        Plaintiffs argue that the trial court erred when it denied their motion to amend the complaint to conform the pleadings to the proofs. In their motion, plaintiffs alleged that Kalpita was the sole member of KAP and that her husband, Paresh, acted as her agent.

¶ 85        Section 2-616(c) states: "A pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." 735 ILCS 5/2-616(c) (West 2006). The test is "whether the allowance of the amendment furthers the ends of justice." *American National Bank & Trust Co. of Chicago v. Dozoryst*, 256 Ill. App. 3d 674, 678 (1993). This includes whether "the amendments alter[ed] the nature of proof required to defend" and whether "the other party would be prejudiced or surprised." *Id.* at 679. "Any doubt as to whether pleadings should be amended should be resolved in favor of an amendment." *Id.* The standard of review is abuse of discretion. *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6, 24 (1992).

¶ 86        Here, the record shows evidence of a principal-agent relationship. "Under the doctrine of *respondeat superior*, a principal may be held liable for the negligent actions of an agent that caused a plaintiff's injury, even if the principal does not himself engage in any conduct in

28

relation to the plaintiff." *Sperl v. C.H. Robinson Worldwide, Inc.*, 408 Ill. App. 3d 1051, 1057 (2011). Kalpita became the sole member of KAP after buying all the company shares, and Paresh became the sole manager. At various points in her testimony, Kalpita testified that she could not answer certain questions because Paresh kept the business records and handled the day-to-day transactions of the business. Her testimony indicates that she heavily and almost exclusively relied on Paresh to maintain KAP. Based on this information, amending the pleadings would not alter the nature of evidence required to defend the principal-agent claim.

¶ 87    Furthermore, defendants were not prejudiced or surprised by plaintiffs' principal-agent claim. In fact, plaintiffs included a principal-agent relationship allegation in their fourth amended complaint. In the complaint, under amended count XII, it states:

> "23. At all times material hereto Defendant Kalpita was either a co-member or the sole member of KAP Family Investments, Inc.
>
> 24. As such, *she delegated the authority to act on KAP's behalf to Paresh Patel who acted on behalf of the LLC*." (Emphasis added.)

Because defendants were aware of this count, they would not be prejudiced or surprised if the pleadings were amended. Therefore, we determine the trial court erred when it denied plaintiffs' motion to conform pleadings to the proofs.

¶ 88    Turning to plaintiffs' request for judgment, we found the record reveals evidence of a principal-agent relationship between Paresh and Kalpita. As stated previously, Kalpita had little involvement with her own business because she trusted her husband to handle the finances in the business, allowed her husband to do all the day-to-day transactions, and allowed him to possess

29

and maintain all the business records. Therefore, we grant judgment in favor of plaintiffs and against defendants on the principal-agent claim.

¶ 89     Defendants argue that plaintiffs' principal-agent relationship claim is time-barred by the statute of limitations for common-law fraud. However, as plaintiffs have argued, Kalpita's bankruptcy case tolled the fraud claim during the five-year limitations period. In fact, defendants' attorney conceded to the tolling, stating: "To save some time, he is right on the bankruptcy tolling thing. So the statute of limitations argument he is right on." Because of defendants' attorney's comment, the trial court excluded the statute of limitations argument from its ruling: "With regard to the Motion to Conform The Pleadings To The Proofs, uhm, with the exception of the argument that the statute of limitations has expired, *because Mr. Loftus conceded that argument*, with that exception I find more compelling the written and oral arguments made by defense, and accordingly the motion, that post-trial motion is also denied." (Emphasis added.) Thus, defendant's argument fails on this issue.

¶ 90     The record is unclear, and the parties have not briefed, regarding the exact calculation of damages as it pertains to KAP's default judgment and its effect on the $700,000 final judgment. Therefore, we remand this case for a new calculation of damages and costs, including an assessment of attorney fees and any damages related to plaintiffs' principal-agent claim.

¶ 91                                    CONCLUSION

¶ 92     The judgment of the circuit court of Whiteside County is affirmed in part and reversed in part, and the cause is remanded for further proceedings.

¶ 93     Affirmed in part and reversed in part; cause remanded.